[No. A059808. First Dist., Div. Two. Mar. 7, 1994.]

NORMAN I. KRUG REAL ESTATE INVESTMENTS, INC., Plaintiff and Appellant, v.
ROMAN PRASZKER et al., Defendants and Respondents.

## COUNSEL

Roberts, Helfrich & Waughtel and Michael Waughtel for Plaintiff and Appellant.

Gordon & Rees, James M. Hanavan and J. Kevin Moore for Defendants and Respondents.

## OPINION

**SMITH, J.**—Plaintiff Norman I. Krug Real Estate Investments, Inc. (Krug) and defendants Roman Praszker (Praszker) and West & Praszker Realtors, Inc. (West & Praszker) have filed a joint application for stipulated reversal of a judgment against the defendants as part of a settlement of the above action, which is now pending on appeal in this court.

For the reasons explained below, we will grant the request as to West & Praszker, but under the "extraordinary circumstances" exception to the rule pronounced in *Neary* v. *Regents of the University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119], we will deny the request as to defendant Roman Praszker.

## BACKGROUND

The judgment the parties now seek to have reversed was entered after the case was remanded to the superior court for reasons set forth by this court in *Norman I. Krug Real Estate Investments, Inc.* v. *Praszker* (1990) 220 Cal.App.3d 35 [269 Cal.Rptr. 228] *(Krug)*.

In that opinion we affirmed the judgment of the trial court in favor of Krug but remanded to the superior court to make new findings and an apportionment of Krug's damages based on his own comparative negligence. *(Krug, supra,* 220 Cal.App.3d at p. 45.) On remand, the superior court issued an amended judgment reducing Krug's damage award from $27,144.73 to $14,929.60. Krug appealed from the amended judgment.

Soon after the appeal was filed, counsel for the parties requested a settlement conference (Ct. App., First Dist., rule 3(c)(1)), which was held before a justice of another division. On March 15, 1993, counsel jointly filed a "Stipulation Regarding Dismissal, Costs and Remittitur" stating in its entirety that the parties "hereby stipulate, by and through their attorneys of record, that the appeal be dismissed, that the parties are to bear their own costs and that the remittitur issue forthwith." Two days later the presiding justice of this division issued an order stating that "Counsel having so stipulated, the appeal on file herein is ordered dismissed with each party to bear its own costs on appeal and the remittitur is to issue forthwith." The remittitur issued the same day.

On March 29, 1993, the parties filed a stipulation seeking recall of the remittitur so that we could reassert jurisdiction and issue another remittitur in line with an intention of the parties not previously disclosed. As stated in this second stipulation, the parties "miscommunicated their intentions as to the filing of the Stipulation with the court and did not intend for a remittur [*sic*] to issue solely pursuant to that Stipulation." Evidently, the stipulation filed on March 15, upon which the court acted, did not accurately represent the intention of the parties and was inconsistent with a "Joint Application" filed two days later, which the court had not seen at the time it issued the order dismissing the appeal.

The joint application states:

"1. Appellant and respondents have entered into an agreement pursuant to which they have resolved their disputes embodied in this appeal and the underlying Superior Court action.

"2. *Appellant and respondents agree that the September 24, 1992 judgment of the Superior Court of the City and County of San Francisco . . . should be reversed.* [Italics added.]

"3. On remand, appellant and respondents further agree that the Superior Court in and for the City and County of San Francisco should be directed to dismiss this entire action with prejudice.

"4. Appellant and respondents agree that this agreement and joint application have not been obtained by fraud or deceit but rather were entered into based upon good faith negotiations and after consultation with their respective counsel.

"5. Appellant and respondents agree to bear their own costs of appeal.

"6. This joint application is based upon this application, the points and authorities filed herewith, and the record on file herein."

The points and authorities filed with the joint application consists of five sentences and relies entirely on the holding in *Neary* v. *Regents of the University of California, supra*, 3 Cal.4th 273 *(Neary)*. In *Neary*, the California Supreme Court held "that, when the parties to an action agree to settle their dispute and as part of their settlement stipulate to a reversal of the trial court judgment, the Court of Appeal should grant their request for the stipulated reversal absent a showing of extraordinary circumstances that warrant an exception to this general rule." *(Id.,* at p. 284.) The parties' joint application states simply that because "no extraordinary circumstances exist herein [the] joint application should be granted and the lower court's judgment reversed with instructions to dismiss the case with prejudice."

DISCUSSION

I

*Neary* states that "[s]imple fairness requires that the first and most weighty consideration be given to the parties' interests and that they be accommodated except in the [most] extraordinary case. The parties are the persons (or entities) most affected by a judgment, which is the ultimate product of their sustained effort and expense. [Citation.] Homilies about 'judicial integrity' and 'legal truth' will ring hollow in the ears of the parties. The courts exist for litigants. Litigants do not exist for courts." *(Neary, supra,* 3 Cal.4th at p. 280.)

 *Neary* goes on to hold that an "extraordinary circumstance" justifying denial of a request for stipulated reversal exists when reversal would adversely affect the public interest. *(Neary, supra,* 3 Cal.4th at p. 284.) The particular public interest, however, may not be "amorphous and speculative," but must be "specific, demonstrable, well established, and compelling." *(Id.,* at p. 283.) The opinion provides little guidance, however, as to

the nature of the "extraordinary circumstances" warranting an exception to the general rule that such requests will be granted. The court simply announced a "presumption in favor of stipulated reversal" while at the same time stating that the determination whether extraordinary circumstances exist "must be made on a case-by-case basis." (*Id.*, at p. 284.)

Since *Neary* creates a presumption in favor of a stipulated reversal and the parties are under no requirement to come forward with evidence that the public interest exception does *not* apply, we face a considerable handicap in performing our duty to ensure that, in any given case, "no countervailing factors are present, e.g., a contrary public interest." (*Neary, supra,* 3 Cal.4th at p. 284.) Indeed, under normal circumstances, no facts will be available to the court unless a nonparty comes forward and objects to the settlement or unless some problem is apparent from the record. Thus, *Neary* imposes an unusual and difficult responsibility on the courts of appeal.

In an effort to fulfill our duty to ascertain whether the proposed stipulated reversal might fall within the *Neary* exception, we asked the parties to submit letter briefs responding to a series of questions on the subject. One of our inquiries stated: "In making the 'case-by-case' analysis required to determine whether 'extraordinary circumstances' exist warranting departure from the presumption in favor of stipulated reversal, . . . should this court rely solely on the joint representation of the parties that there are no such circumstances[?] Is there any reason the court should not require the stipulating parties to provide notice of their request to the trial judge and/or other parties known to be interested in the case or the public, advising that objections to the request (on the ground that the judgment in question may have collateral estoppel effect or because of 'extraordinary circumstances') may be submitted to the appellate court within a specified period?"

In response, counsel for defendants wrote "[t]he underlying action and this resulting appeal involve a 1982 real estate dispute between two brokers. . . . [And] . . . it does not seem possible that the resolution of this dispute by settlement could prejudice third parties and no such interested parties are known to counsel for either broker."

 Fortuitously, information not called to our attention by the parties suggests that reversal of the entire judgment in this case might well adversely affect a "specific, demonstrable, well established, and compelling" public interest.

## II

Unlike the vast majority of cases in which stipulated reversal will be sought, the present case was the subject of an earlier appeal in which the

underlying substantive issues were addressed in a published opinion. Our opinion in the earlier appeal, which issued more than three years ago, was not adverted to in the request for stipulated reversal. The opinion relates the following facts.

Krug, a real estate investor, possessed a promissory note from a former partner secured by a third deed of trust on an apartment building. Krug agreed not to record the deed in order to facilitate refinancing of the property. When the former partner defaulted on the note and the building was put up for sale, Praszker was the listing real estate broker. Praszker disclosed the existence of the unrecorded deed of trust to a buyer initially interested in the building, but that sale collapsed. One month later, however, the property was sold to the Noble Group, with Praszker acting as the realtor for both buyer and seller. "At no time did Praszker inform Krug of the pending sale to the Noble Group, nor did he tell the Noble Group of the existence of Krug's unrecorded lien." (*Krug, supra*, 220 Cal.App.3d 35, 40.) As a result of the sale, Krug lost his security interest in the property. Krug sued Praszker and the court ruled in his favor. The chief issue on appeal was whether Praszker owed a duty to disclose to the buyer the existence of the third deed of trust or inform Krug of the impending escrow and sale. We held that he did. (*Id.*, at p. 43.) After discussing the case law that recognizes "a fundamental duty on the part of a realtor to deal honestly and fairly with all parties in the sale transaction [citations]" (*id.*, at p. 42), we pointed out that "[t]he imposition of a duty on a realtor to disclose a known unrecorded lien interest is [also] supported by standards already existing in the industry." (*Id.*, at p. 42, citing provisions of the code of ethics of the National Association of Realtors.) We emphasized that "[b]oth the policy of preventing future harm and considerations of moral blame compel the imposition of a duty on the part of a realtor never to allow a desire to consummate a deal or collect a commission to take precedence over his fundamental obligation of honesty, fairness and full disclosure toward all parties." (*Id.*, at p. 43.)

Although we explicitly found that Praszker had a duty of care and that the evidence supported the trial court's determination that the duty had been breached, we agreed with Praszker that "the trial court erred in failing to apportion the damages suffered by Krug to the extent by which they were proximately caused by his own negligence." (*Krug, supra*, 220 Cal.App.3d at p. 45.)

As noted earlier, the trial court on remand simply filed an amended judgment reducing the dollar amount of the award. Thus, our holding that Praszker's failure to disclose violated a real estate broker's duty of care is implicit in the amended judgment and remains intact.

■ The public interest exception to the presumption that requests for stipulated reversal will be granted cannot be defined by formula, though it will more likely be present when the judgment in question involves important public rights, unfair, illegal or corrupt practices, or torts affecting a significant number of persons. Whether stipulated reversal would deprive the public of an important benefit must in every case be determined " 'from a realistic assessment of all the pertinent circumstances.' [Citation.]" (*California Common Cause* v. *Duffy* (1987) 200 Cal.App.3d 730, 745 [246 Cal.Rptr. 285].)

Civil judgments against state licensed professionals or tradespersons obtained upon grounds of "[d]ishonesty, fraud or gross negligence" (see, e.g., Bus. & Prof. Code, § 5100, subd. (c) [accountants]), or failure to comply with certain contractual obligations (see, e.g., *id.*, §§ 7113 [contractors] and 9993, subd. (h) [employment agencies]), often provide a basis for license suspension or revocation. Entry of a judgment in these cases thus carries a salutary effect which goes beyond the dispute between the parties and affects the public interest. A reversal of such a judgment not due to legal error but solely to effectuate settlement between the parties might deprive the state and its regulatory boards of information necessary to protect the public against incompetent or unethical licensees.

■ Here, stipulated reversal of the judgment against Praszker would interfere with the disciplinary scheme set forth in California's Real Estate Law. Section 10177.5 of the Business and Professions Code (all further unspecified statutory references are to that code) states that "When a final judgment is obtained in a civil action against any real estate licensee upon grounds of fraud, misrepresentation, or deceit with reference to any transaction for which a license is required under this division, the commissioner may [after hearings] . . . suspend or revoke the license of such real estate licensee." "Deceit" is defined in the Civil Code as including "The suppression of a fact, by one who is bound to disclose it . . . ." (Civ. Code, § 1710, subd. (3).) Misrepresentation may be intentional or negligent. (1 Miller & Starr, Cal. Real Estate (2d ed. 1989) §§ 1:103, 1:104 [Miller & Starr].) "A negligent misrepresentation is a species of 'actual fraud' and a form of deceit." (*Id.*, § 1.104, at p. 334.)

One of the purposes of the Real Estate Law, of which that statute is a part, "is to insure, as far as possible, that real estate licensees will be honest and truthful in their dealings *with members of the public*." (*State of California* v. *Superior Court* (1984) 150 Cal.App.3d 848, 856 [197 Cal.Rptr. 914], italics added, citing *Brown* v. *Gordon* (1966) 240 Cal.App.2d 659, 667 [49

Cal.Rptr. 901]; *Buckley* v. *Savage* (1960) 184 Cal.App.2d 18, 31-32 [7 Cal.Rptr. 328].) Accordingly, the real estate commissioner may discipline a licensed broker for failure to disclose even if the broker was not intentionally fraudulent or dishonest (*De St. Germain* v. *Watson* (1950) 95 Cal.App.2d 862, 867 [214 P.2d 99]) and it is immaterial that he received no advantage from his failure to disclose. (*Id.,* at p. 870.) Praszker's breach of duty here falls within the type of conduct which could be grounds for disciplinary action.

Recently this court (Division One) held that under section 10177.5, ". . . if the elements of fraud have been proved in the civil action, collateral estoppel principles bar the licensee from attempting to relitigate those facts" in disciplinary proceedings before the commissioner. (*California Real Estate Loans, Inc.* v. *Wallace* (1993) 18 Cal.App.4th 1575, 1582 [23 Cal.Rptr.2d 462], review den. Dec. 30, 1993.)

■ ▬ ■ ■ Here, a reversal of the judgment against Praszker, stipulated or not, would effectively deprive the commissioner of the ability to act pursuant to section 10177.5.[1] It would be unconscionable to make it possible for a real estate broker who may have acted unethically to purchase disciplinary immunity from one of the consequences of his impropriety. Our conclusion is underscored by the fact that, unlike analogous statutes pertaining to professional licensees,[2] the Real Estate Law does not require licensed brokers or their insurers to notify the regulatory agency of the settlement of

---

[1]Defendants claim that the judgment no longer can form the basis for disciplinary action against Praszker because section 10101 provides that an accusation against a state licensee must be filed no later than three years from the occurrence of the alleged grounds for disciplinary action unless it involves "fraud, misrepresentation or false promise in which case the accusation shall be filed within one year after the date of discovery by the aggrieved party" of the fraud, etc. Since Krug's complaint was filed on March 18, 1985, defendants hypothesize that the commissioner's power to impose discipline expired, at the latest, on March 18, 1988.

The argument is misconceived. Krug is not the "aggrieved party" referred to in section 10101. Under the statutory scheme, the commissioner is not limited to responding to complaints from third parties, but may act on his own motion. (§ 10176.) Here, the commissioner's authority under section 10177.5 is based on the *entry of a final judgment* against the licensee on grounds of fraud or misrepresentation. It is the *judgment*, not the misconduct, which is the triggering event enabling the Commissioner to launch an investigation, possibly leading to an accusation and disciplinary proceedings. (See 2 Miller & Starr, *supra*, § 4:47, pp. 323-327.) Because the ground for discipline is the entry of a final judgment (of which none exists here yet) the commissioner's power to act under section 10177.5 is not time-barred under section 10101.

[2]A few statutes require certain state licensing agencies to be informed by licensees or their insurers of settlement or arbitration awards on claims for damages caused by the licensee's "fraud, deceit, negligence, incompetency, or recklessness in practice" (§§ 5588, 5589 [architects]; see also §§ 801, 802 [health care providers].) Such statutes complement related

a claim for damages caused by the broker's fraud, deceit, negligence, incompetence or recklessness.

A reversal of this judgment would also be contrary to the public interest for other reasons. ■ First, unlike vacatur, the analogous remedy allowed by some federal courts, "reversal" connotes the affirmative rejection of a judgment. "To reverse a judgment, according to Webster's dictionary, means to over-throw it by a contrary decision, to make it void, to undo or annul it for error." (*Atlantic Coast Line Railroad Co.* v. *St. Joe Paper Co.* (5th Cir. 1954) 216 F.2d 832, 833.) ■ A court-ordered reversal of the judgment could well be interpreted as a judicial nullification of our holding in *Krug* that Praszker violated his professional duty of care as a real estate broker. Because of this common understanding of the effect of "reversal," the danger cannot be obviated by a provision in our order that the reversal "is pursuant to settlement and does not constitute either approval or rejection of the trial court's judgment," as *Neary* allows. (*Neary*, *supra*, 3 Cal.4th 273, 283.)

Second, the precedent caused by a settlement-generated reversal in a case such as this would have dangerous public policy implications. Permitting a licensee to "buy his way out" from under a judgment which might form the basis for disciplinary action by settling at the appellate level would not only reduce incentives for wealthier licensees to conform their conduct to the standards imposed by their profession but also render it less likely that they will settle cases *prior* to judgment, since a licensee-defendant is more apt to gamble on taking his case to trial if the disciplinary consequences of an unfavorable judgment may ultimately be avoided by settling the case in the Court of Appeal. (See *Neary*, *supra*, 3 Cal.4th at p. 290 (dis. opn. of Kennard, J.).)

We conclude that when a judgment in a civil action is against a state licensee and such judgment may provide the basis for disciplinary action against that licensee, an appellate court may deny an application for stipulated reversal based upon the "public interest" exception carved out in *Neary*.

III

In a prior decision of this court which this opinion supersedes, we denied the motion as to both Praszker and West & Praszker. We granted rehearing

statutes requiring that the regulatory agency be directly notified by the trial court where such an unsettled claim results in a civil judgment against the licensee. (§§ 803, 5590.)

and calendared this motion for oral argument after being advised of the fact that Praszker no longer owns West & Praszker, having sold the business in 1985 to Michael Klestoff under whose license it now operates. Counsel for defendants informs us that Klestoff wishes to have the judgment vacated for reasons which include bonding, insurance and business reputation. Counsel further represents that Praszker is of advanced age, no longer licensed as a broker, and in ill health.

The incremental and haphazard fashion in which important information regarding this case has come to us highlights the dilemma posed by *Neary*. Faced with a presumption in favor of reversal but concurrent duty to apply the extraordinary circumstance exception on a "case-by-case" basis, we made a general inquiry as to the effect of the proposed reversal on third parties. Counsel represented that to their knowledge no third parties would be affected, but failed to mention our earlier published decision and the possible ramifications of a stipulated reversal due to the provisions of the Real Estate Law noted above. Only after we issued an opinion denying the motion in its entirety did the parties step forward with further information causing us to reevaluate our earlier conclusions.

In order to alleviate such problems in future cases, this district has adopted local rule 8 (eff. Jan. 18, 1994) entitled "Motions for Stipulated Reversal of Judgment" which requires the parties to inform the court of certain facts which might indicate that reversal of the judgment would be contrary to the public interest.[3]

The facts brought to our attention in the petition for rehearing warrant granting the motion as to West & Praszker. That agency has been sold by Praszker and is now owned and operated by a third party, who had nothing to do with the transaction underlying the judgment. Consequently, there are no extraordinary circumstances which merit denial of the motion as to the agency.

We reach a different conclusion as to Praszker, the individual. Defendants' representations which indicate the unlikelihood that the judgment will

---

[3]Local rule 8 provides: "A motion filed in this court for stipulated reversal of a judgment of a trial court must include a joint declaration of counsel that (1) describes the parties and the factual and legal issues presented at trial; (2) indicates whether the judgment involves important public rights or unfair, illegal or corrupt practices, or torts affecting a significant number of persons, or otherwise affects the public or a significant number of persons not parties to the litigation (if the judgment is against a state licensee, the declaration must also disclose whether it exposes such person to any possible disciplinary proceeding); and (3) discloses whether the judgment sought to be reversed may have collateral estoppel or other effects in potential future litigation and, if so, whether any third parties who might be prejudiced by stipulated reversal of the judgment have received notice of the motion therefor. A copy of the judgment must accompany the motion."

*in fact* ever be used as a basis for disciplining Praszker are, as we see it, irrelevant. One of the purposes for the *Neary* rule is to spare appellate courts the burden of expending significant resources necessitated by detailed fact-finding inquiries in individual cases (3 Cal.4th at p. 284). That Praszker is no longer active in the real estate community is a fortuitous event which in no way diminishes the policy reasons against court-ordered reversal in a case such as this.

In our view, it is enough that the judgment *may* provide the basis for disciplinary action against the defendant and that reversal impinges, or appears to impinge, upon the authority of a state agency to regulate real estate licensees and thereby protect the public. As noted, reversal would also present the appearance of judicial eradication of an important prior published opinion of this court defining the duties of real estate brokers. For all of these reasons, we find that reversal of the judgment against Roman Praszker would be contrary to the public interest as defined in *Neary* and that his application for stipulated reversal should be denied.

## DISPOSITION

The joint application for recall of remittitur is granted. Pursuant to the parties' stipulation for settlement, the judgment appealed from is reversed and the trial court directed to dismiss the action with prejudice as to defendant West & Praszker *only*. Said reversal does not represent a considered rejection by this court of the judgment below. This order shall not affect the judgment against defendant Praszker.

Benson, J., concurred.

**KLINE, P. J.,** Concurring.—When it legitimated the practice of stipulated reversal in *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119] our Supreme Court rejected the prevailing federal view that the judicial system ought not allow the judgment of a court, "created at cost to the public and other litigants, to be a bargaining chip in the process of settlement." (*Matter of Memorial Hosp. of Iowa County, Inc.* (7th Cir. 1988) 862 F.2d 1299, 1302.)[1] *Neary* did not merely authorize stipulated reversal in appropriate circumstances, as the parties in

---

[1]The views of all the federal circuits that have taken a position on this issue are summarized in *Oklahoma Radio Associates* v. *F.D.I.C.* (10th Cir. 1993) 3 F.3d 1436, 1439-1444. *Neary* is also inconsistent with the view of most of the commentators. See Barnett, *Making Decisions Disappear: Depublication and Stipulated Reversal in the California Supreme Court* (1993) 26 Loyola L.A. L.Rev. 1033, 1057-1084; Fisch, *Rewriting History: The Propriety of Eradicating Prior Decisional Law Through Settlement and Vacatur* (1991) 76 Cornell L.Rev. 589; Zeller,

that case had requested, but created a *blanket presumption* in its favor, which they did not seek. (See Barnett, *Making Decisions Disappear, supra,* 26 Loyola L.A. L.Rev. 1031, 1061.) That presumption is destined to plague the appellate courts of this state.

According to the Supreme Court, a strong presumption in favor of stipulated reversal relieves the parties of "the burden of showing that their stipulation should be granted because no countervailing factors are present, e.g., a contrary public interest." (*Neary, supra,* 3 Cal.4th at p. 284.) Because the parties do not have to submit "supporting declarations and documentary evidence" the appellate court is assertedly relieved of the responsibility "to fully consider these materials." (*Ibid.*) "Under a presumption in favor of granting the parties' request for reversal, the court need not expend significant resources unless a nonparty comes forward and objects to the settlement for some reason or unless some problem is apparent in the record." (*Ibid.*)

The trouble with this theory is that it deprives the appellate courts of the ability to determine intelligently whether the public interest exception that *Neary* allows may apply, or whether there may be other "extraordinary circumstances" warranting denial. *Neary* overlooks the fact that joint requests for stipulated reversal do not arise in the adversarial context American courts take for granted. They are by nature collaborative. Therefore, as the commentators have noted, "the court cannot rely on the assumption that a problem will be 'apparent in the record,' or that an affected nonparty will get notice of the proceeding and thus be able to 'come[ ] forward and object[ ].' Rather the court of appeal will have to consider *sua sponte,* in inquisitorial fashion, the possible existence and interests of third parties who might be affected by the settlement. American courts may not excel at this unfamiliar task. Hence there will be a continuing risk of cutting off the rights of unconsidered third parties, with resulting problems of due process, as well as a continuing potential for compromise to the neutrality and reputation of the courts." (Barnett, *Making Decisions Disappear, supra,* 26 Loyola L.A. L.Rev. at pp. 1074-1075; accord Zeller, *Avoiding Issue Preclusion by Settlement Conditioned Upon the Vacatur of Entered Judgments, supra,* 96 Yale L.J. at p. 879 [stipulated reversal allows the parties to a dispute "to conspire against the interests of unrepresented future parties and the judicial system. In a party-initiated, party-controlled procedural regime, such a device has enormous potential for abuse"]; Fisch, *Rewriting History, supra,* 76 Cornell

*Avoiding Issue Preclusion by Settlement Conditioned Upon the Vacatur of Entered Judgments* (1987) 96 Yale L.J. 860, 868; Resnik, *Finding the Factfinders,* chapter 15, in *Verdict: Assessing the Civil Jury System* (Litan ed.) (Brookings Inst. 1993) pp. 500-530. But see Note, *Settlement Pending Appeal: An Argument for Vacatur* (1989) 58 Fordham L.Rev. 233.

L.Rev. at p. 621, fn. 165 [". . . it is rare that third parties who might benefit from the preclusive effect of a judgment will learn of the threat to the judgment in time to make their presence known to the court"]; Resnik, *Judging Consent* (1987) U.Chi. Legal F. 43, 101 ["Absent the adaptation of some forms of continental procedure in which the court and its staff (rather than the litigants) develop information, judges are ill-equipped to do much other than nod when the litigants join together and seek court approval"].) Because judges will ordinarily be unable to determine the nature and propriety of compromises that result in joint requests for stipulated reversal, the consequences of the presumption established in *Neary* will inevitably include the unknowing judicial effectuation of some highly questionable private bargains.

By relieving counsel of the burden of showing that there is no public interest or "extraordinary circumstance" justifying denial of a request for stipulated reversal, and by declaring that the Courts of Appeal "need not expend significant resources" on these questions, *Neary* has placed the Courts of Appeal in a quandary: we are obliged to ignore either the presumption or the risks it creates.

*Neary* suggests the risks are minor and worth taking on the curious ground that stipulated reversal is inconsequential. According to *Neary*, stipulated reversal will create "no inference that the jury or trial court erred. Whatever conclusions the public wishes to draw from the litigation can still be drawn after the reversal." (*Neary*, *supra*, 3 Cal.4th at p. 283.) If the inference that the reversed judgment was wrong or ineffectual could not be drawn, or if stipulated reversal did not at least create some ambiguity about the validity or force of the judgment reversed, such relief would rarely be sought. The most common reason parties seek vacatur, a similar remedy allowed in certain circumstances by some federal courts (see, e.g., *Scott* v. *Iron Workers Local 118* (9th Cir. 1991) 928 F.2d 863),[2] is to destroy a judgment's collateral estoppel effect. (Fisch, *Rewriting History*, *supra*, 76 Cornell L.Rev.

[2]The Ninth Circuit has adopted the rule, originally articulated in *Ringsby Truck Lines* v. *Western Conference of Teamsters* (9th Cir. 1982) 686 F.2d 720, that an appellate court should not vacate a lower court opinion where the appellant, having lost below and desiring to avoid the collateral estoppel effects of the adverse judgment, causes the appeal to become moot. The so-called *Ringsby* exception (to the rule declared in *United States* v. *Munsingwear* (1950) 340 U.S. 36 [95 L.Ed. 36, 71 S.Ct. 104], that appellate courts must ordinarily vacate judgments that have become moot due to circumstances over which the appellant had no control) is based on the view that otherwise any litigant dissatisfied with the trial court's findings could easily have them "wiped from the books." (686 F.2d at p. 721.)

A plurality of the other federal circuits refuse outright to vacate judgments to facilitate negotiated dispositions. (See, e.g., *Matter of Memorial Hosp. of Iowa County, Inc.*, *supra*, 862 F.2d 1299; *Clarendon, Ltd.* v. *Nu-West Industries, Inc.* (3d Cir. 1991) 936 F.2d 127; *In re*

at p. 616; Note, *Collateral Estoppel Effects of Judgments Vacated Pursuant to Settlement* (1987) 1987 U.Ill. L.Rev. 731.) These efforts have created complex and as yet unresolved problems in those jurisdictions in which vacatur is available. (Zeller, *Avoiding Issue Preclusion by Settlement Conditioned Upon the Vacatur of Entered Judgments, supra,* 96 Yale L.J. 860; see also, Note, *The Impact of Collateral Estoppel on Postjudgment Settlements* (1985) 15 Sw.U.L.Rev. 343.) Stipulated reversal, which indicates much more strongly than vacatur that the judgment has been affirmatively rejected, will surely be sought for this and perhaps an even greater array of dubious purposes.

The danger cannot be wholly eliminated by a local rule requiring parties seeking stipulated reversal to disclose information that might justify denial of their request. Among other things, the parties may not then know whether the judgment they seek to reverse may, for example, have collateral estoppel or other effects in potential future litigation, or whether any third parties might otherwise be prejudiced. Some litigants will likely resolve doubts in their own favor and eschew an assiduous investigation that might unearth information detrimental to their cause.

Nor can the danger that stipulated reversal will be abused be eliminated by a provision in the order that reversal "is pursuant to settlement and does not constitute either approval or rejection of the trial court's judgment," as *Neary* allows. (3 Cal.4th at p. 283.) Such a disclaimer does not clearly countermand the ordinary understanding of the word "reversal" and, in any case, is not required to be communicated to third parties and is not otherwise self-executing. Few litigants will gratuitously reveal information suggesting that a bargained-for reversal may be inefficacious.

It is not too soon for our Supreme Court to reconsider the propriety of stipulated reversal, as other courts that had taken a similar position recently have done. For example, the Tenth Circuit, whose reconsideration may have been prompted by the refusal of a senior trial judge to comply with one of its orders directing vacatur in another case, "pending a reasoned and more detailed order" (*Benavides* v. *Jackson Nat. Life Ins. Co.* (D.Colo. 1993) 820 F.Supp. 1284, 1285), appears to have reversed its policy favoring vacatur.[3]

---

*United States* (D.C.Cir. 1991) 927 F.2d 626 [288 App.D.C. 354].) As earlier noted, the views of the federal circuits that have addressed the issue are summarized in *Oklahoma Radio Associates* v. *F.D.I.C., supra,* 3 F.3d 1436, 1439-1444, an opinion which itself exemplifies the growing movement away from vacatur.

(*Oklahoma Radio Associates* v. *F.D.I.C.*, *supra*, 3 F.3d 1436.) After canvassing the views of all the federal circuits, and declaring that he was expressing the view of "all of the active judges of this court," Judge Holloway stated as follows: "The furthering of settlement of controversies is important and desirable, but there are significant countervailing considerations which we must also weigh. A policy permitting litigants to use the settlement process as a means of obtaining the withdrawal of unfavorable precedents is fraught with the potential for abuse. We agree with the Seventh Circuit that 'an opinion is a public act of the government, which may not be expunged by private agreement.' [Citation.] 'When the parties' bargain calls for judicial action, . . . the benefits of settlement to the parties are not the only desiderata.' [Citation.] 'The precedent, a public act of a public official, is not the parties' property.' [Citation.]" (*Id.*, at p. 1444.)

Still more recently, in *Manufacturers Hanover Trust Co.* v. *Yanakas* (2d Cir. 1993) 11 F.3d 381 (*Yanakas*), the United States Court of Appeals for the Second Circuit questioned the wisdom of its earlier opinion in *Nestle Co.* v. *Chester's Market, Inc.* (2d Cir. 1985) 756 F.2d 280, which held it an abuse of discretion for a trial court to refuse to vacate its judgment if the parties reached a settlement conditioned on such relief. The court had concluded in *Nestle*, as did our Supreme Court in *Neary*, that the importance of honoring settlements took precedence over the finality of judgments. (*Nestle, supra,* 756 F.2d at p. 283.) The Second Circuit refused in *Yanakas* to adhere to *Nestle* for the reason, among others, that granting vacatur to facilitate settlement would allow "a party with a deep pocket" to eliminate a judgment it dislikes "simply by agreeing to a sufficiently lucrative settlement to obtain its adversary's cooperation in a motion to vacate. We do not consider this a proper use of the judicial system." (*Yanakas, supra,* 11 F.3d at p. 384.) *Yanakas* also rejects the view that granting vacatur will conserve judicial resources, pointing to "indications that the promise of judicial economy may be illusory." (*Id.*, at p. 385.) "More importantly," the opinion concludes, "when the proposed savings can be realized only at the cost of increasing the vulnerability of the judicial system to manipulation, we view the investment as unsound." (*Ibid.*)[4]

Judge Kearse, the author of *Yanakas*, relied in part on Justice Stevens's recent condemnation of the routine vacation of judgments by some courts in

---

[3]Perhaps the Tenth Circuit was also motivated by the fact that the parties in *Oklahoma Radio Associates* sought vacatur of the judgment of the Court of Appeals.

[4]This view was also recently adopted by another division of our court in *Lucich* v. *City of Oakland* (1993) 19 Cal.App.4th 494 [23 Cal.Rptr.2d 450], where the parties unsuccessfully sought to apply *Neary* to the judgments of appellate courts. *Lucich* explains that the Court of Appeal "has established procedures for holding settlement conferences . . . in order to spare the parties and the public the costs of appellate proceedings. [Citation.] If the parties desire an impetus for settlement, they should avail themselves of that opportunity. The procedure

his dissent from the dismissal of certiorari as improvidently granted in *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U.S. Philips Corporation* (1993) 510 U.S. __ [126 L.Ed.2d 396, 114 S.Ct. 425] (*Izumi*). Justice Stevens—joined by Justice Blackmun, the only other member of the Supreme Court to take a position on the issue—contended not only that a trial court judgment is a presumptively correct public act that should not be subject to barter by private litigants, but questioned the assumption—which is at the heart of *Neary*—that granting vacatur or stipulated reversal will encourage settlement. "It will, of course, affect the *terms* of some settlements negotiated while cases are pending on appeal, but there is no evidence that the *number* of settlements will be appreciably increased by such a policy. Indeed, the experience in California demonstrates that the contrary may be true." (*Izumi, supra,* 510 U.S. at p. __ [126 L.Ed.2d at p. 408] italics in original.) Justice Stevens bases this latter statement on the fact that prior to *Neary* the rate of settlement in a division of the California Court of Appeal that never granted such motions was twice as high as that in divisions that routinely granted such relief. (*Izumi, supra,* 510 U.S. at p. __, fn. 11 [126 L.Ed.2d at p. 408], citing Barnett, *Making Decisions Disappear, supra,* 26 Loyola L.A. L.Rev. at p. 1073.)

Justice Stevens's assessment is shared by federal trial judges who have addressed the issue. Thus, Sherman G. Finesilver, Chief Judge for the District of Colorado, has emphasized that "[t]he . . . view that vacatur is conducive to settlement is not only empirically unsupported but runs contrary to the experience of this and other district courts: specifically, that vacatur saves far less in circuit court resources than, by its perverse incentive for litigants to stall on settlement until after judgment, it costs the district court and the parties. Vacatur is simply not efficient judicial resource management." (*Benavides* v. *Jackson Nat. Life Ins. Co., supra,* 820 F.Supp. 1284, 1288; see also, *Russell* v. *Turnbaugh* (D.Colo. 1991) 774 F.Supp. 597.)

---

followed here, awaiting oral arguments on a fully briefed appeal and settling after submission and after a written decision is filed, [and then seeking dismissal of the appeal and decertification of the opinion] saves no one's time or money, a prime object of this court's Local Rule 3 [relating to settlement conferences]." (*Id.,* at p. 501.) The court states that the parties' "impermissible motive" was "manipulation of the appellate function to allow litigants to test the judicial water to the fullest while preserving the option of avoiding the precedential effect of an appellate decision if that test proves foreboding." (*Id.,* at p. 502.)

Exactly the same points can be made against permitting stipulated reversal of the judgments of trial courts, which have far more elaborate early settlement procedures than appellate courts and where pretrial settlement would result in far greater savings of judicial resources and public funds. Judge Kearse's opinion in *Yanakas* and Judge Holloway's opinion in *Oklahoma Radio Associates, supra,* which also involved attempts to vacate appellate opinions, implicitly acknowledge that the exaltation of settlement over the finality of judgments, as in *Nestle* and *Neary,* has implications that cannot in principle be limited to the judgments of trial courts. (See also Judge Easterbrook's opinion in *Matter of Memorial Hosp. of Iowa County, Inc., supra,* 862 F.2d at p. 1302.)

*Neary* debases the judicial coin with the currency of a false expediency. It will not only waste judicial resources but undermine respect for judicial institutions. Neither the taxpayers who support the judicial system nor the jurors who participate will easily understand why wealthy litigants should be permitted to purchase reversal of a judgment not shown to be wrong. Trial court support for stipulated reversal is equally unlikely, for as some trial judges have already pointed out, it is their independence that is most directly compromised.[5] Like one of those judges, "[w]e can imagine few practices condoned by the judicial system that would have a less salutary effect on both the reality and the perception of its integrity." (*Benavides* v. *Jackson Nat. Life Ins. Co., supra,* 820 F.Supp. at p. 1289.)

---

[5]United States District Court Judge John R. Hargrove has observed, for example, that settlements calling for the vacating of judgments not only pose "monstrous obstacles" for the efficient management of trial court dockets, but "threaten to undermine the independence and unique role of the judiciary. It is profoundly the duty of courts to declare the state of the law; perhaps this Court erred in its interpretation of the law . . . , but that is a determination properly left for the Fourth Circuit, not private agreement." (*Washington Metropolitan Transit Authority* v. *One Parcel of Land in Prince George's County, Maryland* (D. Md. Nov. 23, 1993) 1993 WL 524783, 1993 U.S. Dist. Lexis 18485.)

Chief Judge Finesilver has described the way in which vacatur is used to distort the law by institutional litigators, "who must return to court many times with the same arguments." (*Benavides* v. *Jackson Nat. Life Ins. Co., supra,* 820 F.Supp. 1284, 1289.) Vacatur allows such litigators "to control the direction and content of the jurisprudence—to weed out the negative precedent and preserve the positive—and create an artificially weighty and one-sided estimate of what comprises 'the case law.'" (*Ibid.*) The victorious party "is typically not a repeat litigator and has little interest in preserving the precedential value of the judgment below." For this reason, and the "pecuniary sweetener" it inevitably receives, the victorious party "has little reason to resist vacatur and take its chances on appeal." (*Ibid.*) In this manner, "[t]he case law becomes what the party with the greatest resources wishes it to be. Economic prowess purchases more persuasive power than the marketplace of ideas and sound reasoning combined." (*Ibid.*)

Judge Finesilver's opinion in *Benavides* explained his refusal to comply with an order of the Tenth Circuit directing him to vacate his prior judgment. (820 F.Supp at p. 1285.) California trial judges should be no less reluctant to advise us of information that may not have been called to our attention by the parties that may warrant reconsideration of an order granting stipulated reversal and directing the trial court to dismiss the action.