[No. A078994. First Dist., Div. Two. Dec. 2, 1997.]

ANDREW MORROW, Plaintiff and Respondent, v.
HOOD COMMUNICATIONS, INC., et al., Defendants and Appellants.

## COUNSEL

Rosenblum, Parish & Isaacs, Andrea J. Ingram and Emily Prescott for Defendants and Appellants.

William Gilg for Plaintiff and Respondent.

## OPINION

**LAMBDEN, J.—** ■ We have before us a motion for stipulated reversal of the judgment of the trial court and dismissal of this appeal. Such motions are not authorized by statute or rule of court but by the decision of our Supreme Court in *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119].

Notice of appeal was filed in this court on June 24, 1997. The issues involved in the appeal have not been identified and briefed by the parties and the record has not yet been filed. What little we know about the case comes from the papers filed in support of the motion for stipulated reversal.

Evidently, plaintiff Andrew Morrow (Morrow) commenced this action against defendants Hood Communications, Inc. (Hood) and Fry & Associates (Fry) for the breach of leases pertaining to separate premises in San Mateo County owned by Morrow. Morrow alleged, among other things, that Hood was the parent corporation of Fry and liable as its alter ego. He additionally alleged that Hood and Fry "had engaged in a de facto merger that rendered Hood liable under the leases." Fry did not deny liability. The primary issue at trial was the relationship between Hood and Fry. After a four-day trial to the court, judgment was rendered for Morrow against both defendants, jointly and severally, in the amount of $51,331.29, together with interest thereon and reasonable attorney fees and costs. The court found that Fry was not the alter ego of Hood but that a de facto merger had occurred and that Hood was therefore liable for Fry's obligations under the lease with Morrow.

Pursuant to rule 8 of the Local Rules of the First Appellate District (23 pt. 3 West's Ann. Rules of Court (1996 ed.) pp. 91-92), which pertains to motions for stipulated reversal,[1] counsel for the parties have filed declarations stating that the judgment does not involve important public rights or

---

[1]Rule 8 provides as follows: "A motion filed in this court for stipulated reversal of a judgment of a trial court must include a joint declaration of counsel that (1) describes the parties and the factual and legal issues presented at trial; (2) indicates whether the judgment

unfair, illegal or corrupt practices, or torts affecting a significant number of persons not parties to the litigation. On the basis of "information and belief" counsel also state that "stipulated reversal of the judgment will not prejudice any third parties," and that they have no knowledge that the judgment sought to be reversed "would have a collateral estoppel or other effect on any other matter, claim, or action."

Because we have no reason to reject the declarations of counsel, we conclude that this case presents none of the "extraordinary circumstances" which under *Neary* v. *Regents of University of California, supra,* 3 Cal.4th 273, must be present in order to deny a motion for stipulated reversal.

Under the principles of stare decisis set forth in *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937], we feel bound by *Neary* and, accordingly, grant the motion. We do not, however, believe that the principles set forth in *Auto Equity* prevent us from respectfully stating our agreement with the fundamental principles set forth by Presiding Justice Kline in his dissent (other than those pertaining to the power of an inferior court to refuse to acquiesce in precedent established by a court of superior jurisdiction) and in his opinion in *Norman I. Krug Real Estate Investments, Inc.* v. *Praszker* (1994) 22 Cal.App.4th 1814, 1825 [28 Cal.Rptr.2d 498] (conc. opn. of Kline, P. J.). We also agree with Presiding Justice Kline that this case provides an appropriate vehicle through which the Supreme Court should reconsider and repudiate the doctrine adopted in *Neary*.

Ruvolo, J., concurred.

**KLINE, P. J.,** Dissenting.—There are rare instances in which a judge of an inferior court can properly refuse to acquiesce in the precedent established by a court of superior jurisdiction. (See Caminker, *Why Must Inferior Courts Obey Superior Court Precedents?* (1994) 46 Stan.L.Rev. 817; Colby, *Two Views on the Legitimacy of Nonacquiescence in Judicial Opinions* (1987) 61 Tul. L.Rev. 1041.) This is, for me, such an instance.

I acknowledge that the opinion of the California Supreme Court in *Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d

involves important public rights or unfair, illegal or corrupt practices, or torts affecting a significant number of persons, or otherwise affects the public or a significant number of persons not parties to the litigation (if the judgment is against a state licensee, the declaration must also disclose whether it exposes such person to any possible disciplinary proceeding); and (3) discloses whether the judgment sought to be reversed may have collateral estoppel or other effects in potential future litigation and, if so, whether any third parties who might be prejudiced by stipulated reversal of the judgment have received notice of the motion therefor. A copy of the judgment must accompany the motion."

859, 834 P.2d 119] requires that the motion before us be granted. I would deny the motion, however, because I cannot as a matter of conscience apply the rule announced in *Neary*.

I do not refuse to acquiesce in *Neary* because I believe the opinion is analytically flawed and empirically unjustified, though, as I have elsewhere explained at length, that is my view. (*Norman I. Krug Real Estate Investments, Inc.* v. *Praszker* (1994) 22 Cal.App.4th 1814, 1825 [28 Cal.Rptr.2d 498] (conc. opn. of Kline, P. J.); see also *People* v. *Barraza* (1994) 30 Cal.App.4th 114 [35 Cal.Rptr.2d 377].)[1] My refusal is instead based on my deeply felt opinion that the doctrine of stipulated reversal announced in *Neary*—a doctrine employed in no other jurisdiction in this nation and unanimously repudiated by the Supreme Court of the United States (*U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership* (1994) 513 U.S. 18 [115 S.Ct. 386, 130 L.Ed.2d 233])—is destructive of judicial institutions.

The debate in *Neary* pertains to the role of the courts. When that case was here we explained our denial of the motion for stipulated reversal as follows: " 'As imperfect as the process of trial may be, it is the way in which our society establishes legal truth. Because it is an adjudicative and not simply a dispositional act, the reversal of a judgment not thought to be legally erroneous simply to effectuate settlement would trivialize the work of the trial courts and undermine the integrity of the entire judicial process.' "[2]

Reversing our ruling, a majority of the Supreme Court dismissed our concerns: "Homilies about 'judicial integrity' and 'legal truth' will ring hollow in the ears of the parties," the court declared. According to the Supreme Court, "The courts exist for litigants. Litigants do not exist for

[1]Suffice it to state here that my views mirror those expressed by Justice Kennard in her dissent in *Neary*, which are consistent with the overwhelming majority of the commentators who have analyzed the majority opinion or the doctrine it espouses. (See, e.g., Resnik, *Whose Judgment? Vacating Judgments, Preferences for Settlement, and the Role of Adjudication at the Close of the Twentieth Century* (1994) 41 UCLA L.Rev 1471; Loudenslager, *Erasing the Law: The Implications of Settlements Conditioned Upon Vacatur or Reversal of Judgments* (1993) 50 Wash. & Lee L.Rev. 1229; Barnett, *Making Decisions Disappear: Depublication and Stipulated Reversal in the California Supreme Court* (1993) 26 Loyola L.A. L.Rev. 1033, 1057-1084; Fisch, *Rewriting History: The Propriety of Eradicating Prior Decisional Law Through Settlement and Vacatur* (1991) 76 Cornell L.Rev. 589; Zeller, *Avoiding Issue Preclusion by Settlement Conditioned Upon the Vacatur of Entered Judgments* (1987) 96 Yale L.J. 860. See also Harmon, *Unsettling Settlements: Should Stipulated Reversals Be Allowed to Trump Judgments' Collateral Estoppel Effects Under Neary?* (1997) 85 Cal.L.Rev. 479.)

[2]Unfortunately, we cannot cite our opinion in *Neary*, which was automatically depublished by the grant of review by the Supreme Court. (Cal. Rules of Court, rules 976(d), 977.) The quoted statement appears in Resnik, *Whose Judgment? Vacating Judgments, Preferences for Settlement, and the Role of Adjudication at the Close of the Twentieth Century, supra,* 41 UCLA L.Rev at p. 1478.)

courts." (*Neary* v. *Regents of University of California, supra,* 3 Cal.4th at p. 280.) In the mind of the *Neary* majority, "[t]he primary purpose of the public judiciary is 'to afford a forum for the settlement of litigable matters between disputing parties.'" (*Ibid.,* quoting *Vecki* v. *Sorensen* (1959) 171 Cal.App.2d 390, 393 [340 P.2d 1020].)

Our Supreme Court thus ascribes to the "public judiciary" exactly the same function as that performed by the private judiciary now firmly established in this state.[3] I cannot accept this view, which I believe misapprehends the role of American courts. The judicial responsibility is fundamentally public. "Adjudication uses public resources, and employs not strangers chosen by the parties but public officials chosen by a process in which the public participates. These officials, like members of the legislative and executive branches, possess a power that has been defined and conferred by public law, not by private agreement. Their job is not to maximize the ends of private parties, nor simply to secure the peace, but to explicate and give force to the values embodied in authoritative texts such as the Constitution and statutes: to interpret those values and to bring reality into accord with them." (Comment, *Against Settlement* (1984) 93 Yale L.J. 1073, 1085; see also Ely, Democracy and Distrust: A Theory of Judicial Review (1980).)

This is the view of the courts endorsed by the United States Supreme Court in *U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership, supra,* 513 U.S. 18. Justice Scalia, who understands the nature of the judicial responsibility to resolve private disputes (see, e.g., *Hewitt* v. *Helms* (1986) 482 U.S. 755, 761 [107 S.Ct. 2672, 2676, 96 L.Ed.2d 654]), reiterated in *Bonner Mall* the observation of Justice Stevens that "'[j]udicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur.'" (513 U.S. at p. 26 [115 S.Ct. at p. 392], quoting *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U.S. Philips Corp.* (1993) 510 U.S. 27, 40 [114 S.Ct. 425, 431, 126 L.Ed.2d 396], Stevens, J., dissenting from dismissal of certiorari as improvidently granted.) For this reason, *Bonner Mall* concludes that vacatur on consent (the federal version of stipulated reversal) "disturb[s] the orderly operation of the federal judicial system," and conflicts with "the public interest." (*Bonner Mall, supra,* 513 U.S. at p. 27 [115 S.Ct. at p. 392].) In effect, the United States Supreme Court agreed with Judge Easterbrook that

---

[3]Guccione, *Selling Justice* (Oct. 1991) 11 Cal.Law. 32. See also Kim, *Rent-a-Judges and the Cost of Selling Justice* (1994) 44 Duke L.J. 166; Comment, *Private Means to Public Ends: Implication of the Private Judging Phenomenon in California* (1984) 17 U.C. Davis L.Rev. 611; Note, *The California Rent-A-Judge Experiment: Constitutional and Policy Considerations of Pay-As-You-Go Courts* (1981) 94 Harv. L.Rev. 1592.

the judicial process must not permit the judgment of a trial court, "created at cost to the public and other litigants, to be a bargaining chip in the process of settlement. The precedent, a public act of a public official, is not the parties' property." (*Matter of Memorial Hosp. of Iowa County, Inc.* (7th Cir. 1988) 862 F.2d 1299, 1302.)

The least of the dangers embodied in *Neary* is that stipulated reversal will "engender[] in trial judges and jurors a sense of demoralization because the legal regime that they determined to be 'just' is discarded, without explanation other than that of the parties' desires." (Resnik, *Whose Judgment? Vacating Judgments, Preferences for Settlement, and the Role of Adjudication at the Close of the Twentieth Century, supra,* 41 UCLA L.Rev. at p. 1533.) The much greater danger is a public perception that civil judgments are commodities that may be bought and sold, which is sure to undermine the public respect for judicial institutions that is the genuine source of judicial authority. Should this occur, it is the rule of law that would be endangered, not just the reputation of the courts of this state.

*Neary* brushes off this threat to the integrity of the judicial process on the strange theory that stipulated reversal, which it goes to such pains to defend, is ineffectual. According to *Neary,* stipulated reversal will create "no inference that the jury or trial court erred. Whatever conclusions the public wishes to draw from the litigation can still be drawn after reversal." (*Neary* v. *Regents of University of California, supra,* 3 Cal.4th at p. 283.) This makes no sense. If stipulated reversal justified no such inference the remedy would never be sought.

The parties in this case waived a jury and submitted their dispute to the Honorable Harlan K. Veal, Judge of the San Mateo Superior Court. After conducting a public trial, Judge Veal made a variety of factual determinations and on that basis rendered judgment for the plaintiff. For reasons not revealed by the record, the defendants induced the plaintiff to agree to the reversal of that judgment as a condition of settlement. This bargain would have been pointless unless defendants believed our order would cast doubt on the validity or force of the judgment of the trial court. The parties have not, however, even claimed, let alone shown, that the judgment rendered by Judge Veal is erroneous in any way, and it remains presumptively correct. The reversal of such a judgment is either a travesty or a charade. In either case, I refuse to participate. "Judicial decisions are not for sale." (*Russell* v. *Turnbaugh* (D.Colo. 1991) 774 F.Supp. 597, 600, citing *Clarendon Ltd.* v. *Nu-West Industries, Inc.* (3d Cir. 1991) 936 F.2d 127, 129.)

I am not the first judge to refuse to apply the doctrine articulated in *Neary.* (*Benavides* v. *Jackson Nat. Life Ins. Co.* (D.Colo. 1993) 820 F.Supp. 1284,

1285.)[4] My conscientious refusal to acquiesce is not designed to offend our Supreme Court, for which I have the most profound respect. It is constitutionally justified and, I hope, constructive. As has been stated, "[s]o long as the lower court may still be reversed by the higher court, there is no interference with either the 'supremacy' of the Supreme Court or with the idea of the rule of law. While lower courts may be 'inferior' in the hierarchy—i.e., their decisions can be *countermanded* by a higher tribunal—they are not constitutionally *subordinate* in terms of either their duties under the Constitution or their relationship to higher courts. . . . [¶] Neither can it be said that 'underruling' actually undermines the rule of law, so long as the superior court is allowed to review and reverse. Indeed, quite to the contrary, such 'underruling' may be an essential part of the process of judicial self-correction, and has occurred in the past to force Supreme Court reconsideration of questionable constitutional decisions." (Paulsen, *Accusing Justice: Some Variations on the Themes of Robert M. Cover's Justice Accused* (1990) 7 J. Law & Religion 33, 85-86, fns. omitted.)[5]

While I will refuse to apply the *Neary* rule when asked to do so by litigants, I will of course comply with an order of the California Supreme Court to grant a particular request for stipulated reversal, a purely ministerial act.

---

[4]Prior to the 1994 decision of the United States Supreme Court decision in *U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership, supra,* 513 U.S. 18, prohibiting vacatur on consent of the parties, the Tenth Circuit was among a minority of the federal circuit courts that allowed that remedy. (See, e.g., *The Post Office* v. *Portec, Inc.* (10th Cir. 1991) 935 F.2d 1105.) In May 1993, after he was ordered by the Tenth Circuit to vacate his prior judgment and order and to dismiss the complaint, on the stipulation of the parties, the Honorable Sherman G. Finesilver, Chief Judge of the Federal District Court for the District of Colorado, stated that he respectfully declined to do so "pending a reasoned and more detailed order from the Court of Appeals." *(Benavides* v. *Jackson Nat. Life Ins. Co., supra,* 820 F. Supp. 1284, 1285.) Six months later, in *Oklahoma Radio Associates* v. *F.D.I.C.* (10th Cir. 1993) 3 F.3d 1436, the Tenth Circuit overruled its prior opinions indicating that a settlement agreement may oblige the court to direct that a judgment be vacated. (*Oklahoma Radio Associates, supra,* at p. 1444.)

[5]The author of this article provides such an example. "One of the most important, renowned examples of Supreme Court reconsideration of a constitutional holding—the flag salute cases—came about as a result of such 'underruling' by a three-judge district court. In 1940, in *Minersville School District* v. *Gobitis* [(1940) 310 U.S. 586 [60 S.Ct. 1010, 84 L.Ed. 1375]] the court upheld (8-1) a compulsory flag salute against a free exercise clause challenge. Just three years later, in *West Virginia State Board of Education* v. *Barnette* [(1943) 319 U.S. 624 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674]], the court reversed itself (6-3). Importantly, the decision of the Supreme Court was an *affirmance*; the three-judge district court had 'underruled' *Gobitis. Barnette* now stands as one of the Supreme Court's most famous defenses of religious liberty and freedom of conscience under the First Amendment." (Paulsen, *Accusing Justice: Some Variations on the Themes of Robert M. Cover's Justice Accused, supra,* 7 J. Law & Religion at p. 86, fns. omitted.)

*Neary,* which has no beneficial results,[6] has not stood up to scrutiny. It is an unwise and even dangerous decision that warrants reconsideration by our Supreme Court. However, because motions for stipulated reversal are by nature collaborative and almost never opposed, and because the Courts of Appeal have little discretion to deny them, petitions for review to the Supreme Court are unlikely. That court will therefore have few opportunities to reconsider *Neary* unless it exercises its power to review on its own motion. (Cal. Rules of Court, rule 28(a)(1).) This case provides an excellent opportunity for the exercise of that power.

---

[6]The assertion in *Neary* that the doctrine of stipulated reversal will facilitate settlement is demonstrably false. In *Izumi Seimitsu Kogyo Kabushiki Kaisha* v. *U.S. Philips Corp., supra,* 510 U.S. 27, Justice Stevens rejected *Neary*'s assumption that granting vacatur or stipulated reversal will encourage settlement. "It will, of course effect the *terms* of some settlements negotiated while cases are pending on appeal, but there is no evidence that the *number* of settlements will be appreciably increased by such a policy. Indeed, the experience in California demonstrates that the contrary may well be true." (*Id.,* at p. 40 [114 S.Ct. at p. 431].) Justice Stevens bases this latter statement on the fact that prior to *Neary* the rate of settlement in a division of the California Court of Appeal that never granted such motions was twice as high as that in divisions that routinely granted such relief. (*Id.,* at p. 40, fn. 11 [114 S.Ct. at p. 432].)