[No. A111643. First Dist., Div. Four. Oct. 10, 2006.]

STATE FARM GENERAL INSURANCE COMPANY, Plaintiff and Appellant, v.
WELLS FARGO BANK, N.A., et al., Defendants and Respondents.

1100

Counsel

Law Offices of Rodney A. Marraccini, Rodney A. Marraccini; Law Office of Stephen M. Tamchin and Stephen Michael Tamchin for Plaintiff and Appellant.

Murphy, Pearson, Bradley & Feeney, Timothy J. Halloran and Summer Michelle Smith for Defendant and Respondent Wells Fargo Bank, N.A.

Carr & Ferrell, Jeffrey M. Capaccio, Ilene H. Goldberg and James W. Lucey for Defendant and Respondent Sunset Scavenger Company.

Spencer Law Firm and John Stanley Spencer for Defendants and Respondents Estate of Sherwood J. Allen, Wells Fargo Bank, N.A., as Executor of the Estate of Sherwood J. Allen, Keynote Properties, Robert Camozzi, Astrid Lacitis and Mary Williams.

Opinion

**SEPULVEDA, J.—**

## INTRODUCTION

In this subrogation action, State Farm General Insurance Company (State Farm) seeks to recover sums it paid to its insureds, a condominium association and one of the condominium owners, following a fire loss. The fire started in an adjacent apartment building, after an ignition source was placed in a trash can, and the resultant fire spread to the insureds' condominium complex. State Farm sued the neighboring apartment building's owner and trustee, property managers, and refuse company (collectively respondents). It is undisputed that respondents did not place the ignition source in the trash can. Rather, State Farm contends respondents' negligent failure to provide for the safe disposal of fireplace ashes caused the fire, which spread to its insureds' property.

The trial court granted summary judgment in favor of respondents on the ground that State Farm's claims were barred by the doctrine of superior equities, which requires a balancing of the respective equities of the parties in order to determine who should bear the loss. (See *Meyers v. Bank of America etc. Assn.* (1938) 11 Cal.2d 92, 101 [7 P.2d 1084] (*Meyers*); *Golden Eagle Ins. Co. v. First Nationwide Financial Corp.* (1994) 26 Cal.App.4th 160, 171 [31 Cal.Rptr.2d 815] (*Golden Eagle*).) In so ruling, the trial court relied on

*Fireman's Fund Ins. Co. v. Morse Signal Devices* (1984) 151 Cal.App.3d 681, 688 [98 Cal.Rptr. 756] (*Morse*) (insurer not entitled to subrogation against alarm companies for insureds' theft and fire loss, where alarm system failure not primary cause of insureds' loss), and concluded that because respondents did not place the ignition source in the trash can, they were not the primary cause of the fire. The trial court concluded that since respondents were not the primary cause of the fire, the equities of State Farm as the subrogating insurer were not superior to those of respondents. On appeal, State Farm contends that the trial court improperly interpreted and applied the doctrine of superior equities. We agree and reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The estate of Sherwood J. Allen (the Allen Estate) owned a three-unit apartment building (the Allen Property) in San Francisco. Wells Fargo Bank, N.A. (Wells Fargo), as executor of the Allen Estate, contracted with Keynote Properties (Keynote) to manage the Allen Property. In the course of its management duties, Keynote contracted with Sunset Scavenger to provide waste management services for the Allen Property.

On January 5, 2002, a fire started in a trash can in the light well[1] area of the Allen Property and spread to the neighboring condominium complex. Reggie Cabal[2] was a tenant at the Allen Property at the time of the fire. Mr. Cabal's unit had an operable wood-burning fireplace.[3] As the furnace in his unit had not worked since 1994, Mr. Cabal relied on his fireplace as a source of heat.

On January 4, 2002, Mr. Cabal cleaned out his fireplace and placed 20 pounds of ashes in a white plastic bag. He did not check the ashes for the presence of hot embers. Mr. Cabal brought the plastic bag outside and threw it into one of the plastic garbage cans located in the light well of the Allen Property. Metal receptacles were not provided for the disposal of fireplace ashes, and the tenants were not given any instructions regarding the manner in which they were to dispose of such ashes.

At his deposition, Mr. Cabal testified that he would have used a metal can to dispose of his fireplace ashes had one been provided. Mr. Cabal further testified that he would have utilized a metal can even in the absence of safety instructions directing him to do so.

---

[1] The light well is described as an alley separating the Allen Property from the insureds' condominium complex.

[2] Mr. Cabal is not a party to the instant appeal.

[3] At least one other unit had an operable wood-burning fireplace.

The fire caused substantial damage to both the Allen Property and the condominium complex. As a result of the fire loss, State Farm paid approximately $2 million to its insureds. In its subrogation action, State Farm sued, among others, the Allen Estate, Wells Fargo, individually and as executor of the Allen Estate, Keynote,[4] and Sunset Scavenger.

## DISCUSSION

### A. *Standard of Review*

A party is entitled to summary judgment when there is no triable issue of material fact and the party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) A defendant moving for summary judgment must show that one or more elements of the cause of action cannot be established or that there is a complete defense. (Code Civ. Proc., § 437c, subd. (*o*) (1), (2); *Aguilar, supra,* 25 Cal.4th at p. 849.) Once the defendant meets its burden, the burden shifts to the plaintiff to set forth "specific facts" showing that a triable issue of fact exists. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* at p. 849.)

On appeal, we independently review the trial court's ruling and apply the same legal standard that governs the trial court. (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 [76 Cal.Rptr.2d 382].)

### B. *Principals of Subrogation and the Doctrine of Superior Equities*

■ "Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291 [77 Cal.Rptr.2d 296].) It provides a " ' "method of compelling the ultimate payment by one who in justice and good conscience *ought* to make it—of putting the charge where it justly belongs." ' " (*Meyers, supra,* 11 Cal.2d at p. 101, original italics; see also *Morse, supra,* 151 Cal.App.3d at p. 686.)

---

[4] The subrogation action also named Keynote's principals, Robert Camozzi, Astrid Lacitis, and Mary Williams.

In the insurance context, subrogation takes the form of an insurer's right to be put in the position of the insured for a loss that the insurer has both insured and paid. (*Fireman's Fund v. Maryland Casualty Co., supra*, 65 Cal.App.4th at pp. 1291–1292; see also *Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1723 [33 Cal.Rptr.2d 291].) When an insurance company pays out a claim on a property insurance policy, the insurance company is subrogated to the rights of its insured against any wrongdoer who is liable to the insured for the insured's damages. (See *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 272 [37 Cal.Rptr.3d 434] (*Progressive*); see also *Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 104 [102 Cal.Rptr.2d 36] [" 'Subrogation is the insurer's right to be put in the position of the insured, in order to recover from third parties who are legally responsible to the insured for a loss paid by the insurer' "]; *Hodge v. Kirkpatrick Devlopment, Inc.* (2005) 130 Cal.App.4th 540, 548 [30 Cal.Rptr.3d 303].)

■ "Subrogation has its source in equity and arises by operation of law[5] (legal or equitable subrogation). [Citation.] It can also arise out of the contractual language of the insurance policy (conventional subrogation). [Citation.] The subrogation provisions of most insurance contracts typically are general and add nothing to the rights of subrogation that arise as a matter of law. [Citation.]" (*Progressive, supra*, 135 Cal.App.4th at p. 272.) For example, the standard form fire insurance policy, contained in Insurance Code section 2071, includes a provision for subrogation, with the effect that the insurer may require from the insured an assignment of all rights of recovery against any loss to the extent that payment is made in full by the insurer.

"Subrogation places the insurer in the shoes of its insured to the extent of its payment. [Citation.]" (*Progressive, supra*, 135 Cal.App.4th at p. 272.) When standing in the insured's shoes, the insurer has no greater rights than the insured would have, and for that reason is subject to the same defenses assertable against the insured. (*Allstate Ins. Co. v. Loo* (1996) 46 Cal.App.4th 1794, 1799 [54 Cal.Rptr.2d 541].)

While the insurer by subrogation steps into the shoes of the insured, that substitute position is qualified by a number of equitable principles. For example, an insurer cannot bring a subrogation action against its own insured. (See *Truck Ins. Exchange v. County of Los Angeles* (2002) 95 Cal.App.4th 13,

---

[5] Various statutes also provide for a right of subrogation. (See, e.g., Lab. Code, § 3852 [workers' compensation insurer has statutory subrogation rights for payments made to its insured's employees against third parties]; Code Civ. Proc., § 875, subd. (e) [liability insurer that pays to discharge liability of tortfeasor is subrogated to tortfeasor's contribution rights against other tortfeasors]; Ins. Code, § 11580.2, subd. (g) [automobile insurer that pays claims under uninsured motorist coverage subrogated to insured's rights against uninsured motorist].)

21 [115 Cal.Rptr.2d 179] [an insurer that has also issued a liability policy to the tortfeasor responsible for causing the insured's loss cannot enforce subrogation rights].) An insurer also cannot seek subrogation of personal injury claims in the absence of a statutory authority. (See *Fifield Manor v. Finston* (1960) 54 Cal.2d 632, 639–640 [7 Cal.Rptr. 377, 354 P.2d 1073]; see also Lab. Code, § 3852; Ins. Code, § 11580.2, subd. (g).) Additionally, before asserting a subrogation right, an insurer usually must pay the insured, who must have recovered from the loss in full. (See *Sapiano v. Williamsburg Nat. Ins. Co.* (1994) 28 Cal.App.4th 533, 536–537 [33 Cal.Rptr.2d 659].)

■ The most restrictive principle is the doctrine of superior equities, which prevents an insurer from recovering against a party whose equities are equal or superior to those of the insurer. (*Meyers, supra,* 11 Cal.2d at pp. 102–103; *Continental Ins. Co. v. Morgan, Olmstead, Kennedy & Gardner, Inc.* (1978) 83 Cal.App.3d 593, 602 [148 Cal.Rptr. 57] (*Continental*).) The doctrine of superior equities was adopted in California in 1938, in *Meyers, supra,* 11 Cal.2d 92, which held a surety on a fidelity bond[6] could not recover from a bank the amount paid to an employer as reimbursement for forged checks written by a bonded employee, where the bank had not participated in the wrongdoing. (*Meyers, supra,* at pp. 102–103.) In so holding, the court reasoned: "[T]he right to maintain an action of this kind and to a recovery thereunder involves a consideration of, and must necessarily depend upon[,] the respective equities of the parties. Here, the indemnitor [the surety] has discharged its primary contract liability. It has paid what it contracted to pay, and has retained to its own use the premiums and benefits of such contract. It now seeks to recover from the bank the amount thus paid. It must be conceded that the bank is an innocent third party, whose duty to the employer was based upon an entirely different theory of contract, with which the indemnitor was not in privity. Neither the indemnitor nor the bank was the

---

[6] A fidelity bond is a form of surety that protects an employer against employee dishonesty. (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 46 [86 Cal.Rptr.2d 855, 980 P.2d 407].) All surety bonds involve a tripartite relationship: 1) a principal (promisor, debtor, or obligor), 2) an obligee (promisee, creditor, or beneficiary), and 3) a surety. (See Code Civ. Proc., §§ 995.170, 995.130, 995.510; see also *East Quincy Services Dist. v. General Accident Ins. Co.* (2001) 88 Cal.App.4th 239, 243 [105 Cal.Rptr.2d 694] (*East Quincy Services*).) The principal is the party obligated under the original contract. (Code Civ. Proc., § 995.170.) To guarantee that obligation, the principal obtains a surety, usually by paying a premium and signing a contractual indemnity agreement with the surety. (See *East Quincy Services, supra,* at p. 243.) The obligee is the person for whose benefit the bond is given. (Code Civ. Proc., § 995.130.) In the case of a fidelity bond, the principal is the dishonest employee and the obligee is the employer. (See *Sumitomo Bank of Cal. v. Iwasaki* (1968) 70 Cal.2d 81, 87–88 [73 Cal.Rptr. 564, 447 P.2d 956].) However, it is generally recognized that fidelity bonds resemble traditional contracts of insurance more than surety bonds, as they are considered contracts of insurance between an insurer and an employer. (*Cates Construction, Inc. v. Talbot Partners, supra,* at p. 46.)

wrongdoer, but by independent contract obligation each was liable to the employer. In equity, it cannot be said that the satisfaction by the bonding company of its primary liability should entitle it to recover against the bank upon a totally different liability. The bank, not being a wrongdoer, but in the ordinary course of banking business, paid money upon these checks, the genuineness of which it had no reason to doubt, and from which it received no benefits. The primary cause of the loss was the forgeries committed by the employee, whose integrity was at least impliedly vouched for by his employer to the bank. We cannot say that as between the bank and the paid indemnitor [the surety], the bank should stand the loss. Under the facts of this case, as is stated in *Northern Trust Co. v. Consolidated Elevator Co.* [(1919)] 142 Minn. 132 [171 N.W. 265, 4 A.L.R. 510]: 'The right to recover from a *third person* [the bank] does not stand on the same footing as the right to recover from the *principal* [dishonest employee].' (Italics added.)" (*Meyers, supra,* 11 Cal.2d at pp. 102–103.)[7]

Although *Meyers, supra,* 11 Cal.2d 92, specifically addressed the rights of a surety on a fidelity bond, the superior equities rule has been applied in other situations. (See, e.g., *Golden Eagle, supra,* 26 Cal.App.4th 160 [construction payment bond]; *Truck Ins. Exchange v. County of Los Angeles, supra,* 95 Cal.App.4th 13 [contractual indemnity agreement]; *Morse, supra,* 151 Cal.App.3d 681 [fire and theft insurance].) Under the doctrine of superior equities, although an insurer might have a subrogation interest in the insured's claim against the party that caused the loss, it cannot enforce its subrogation rights unless it has equities superior to those of the wrongdoer. (*Hartford, supra,* 220 Cal.App.2d at p. 551.)

### C. *The Doctrine of Superior Equities Applies to State Farm's Claims*

State Farm argues that the doctrine of superior equities does not apply in the instant case because respondents' alleged liability is based in tort. According to State Farm, the doctrine of superior equities applies only where a subrogating insurer seeks to enforce the terms of a separate contract between its insured and a third party.

In subrogation litigation in California, the doctrine of superior equities is critical in determining whether a right of subrogation exists. (*Jones v. Aetna Casualty & Surety Co., supra,* 26 Cal.App.4th at p. 1724; *Rokeby-Johnson v. Aquatronics International, Inc.* (1984) 159 Cal.App.3d 1076, 1084 [206 Cal.Rptr. 232].) State Farm provides no authority, nor can any be found by

---

[7] The opposite conclusion was reached in *Hartford Acc. & Indem. Co. v. Bank of America* (1963) 220 Cal.App.2d 545, 556 [34 Cal.Rptr. 23] (*Hartford*), noting that when the defendant bank's departure from banking custom "became a substantial factor causing the loss, the bank's equity became inferior to that of the surety corporation."

this court, supporting the proposition that the application of the doctrine of superior equities is contingent on the nature of underlying cause of action against the third party.[8]

Although not cited to us by the parties, case law from other jurisdictions indicates that the application of the doctrine of superior equities depends on whether the source of the insurer's right to subrogation arises by operation of law (legal or equitable subrogation) or by contract (conventional subrogation). (See, e.g., *Mutual Service Cas. Ins. v. Elizabeth State Bank* (7th Cir. 2001) 265 F.3d 601, 626–628 (*Mutual Service Cas.*); *National Union Fire Ins. Co. of Pittsburg, Pa. v. Riggs National Bank of Washington, D.C.* (D.C.App. 1994) 646 A.2d 966, 969–972 (*Riggs*); *Federal Ins. Co. v. Arthur Andersen & Co.* (1990) 75 N.Y.2d 366 [553 N.Y.S.2d 291, 522 N.E.2d 870, 874–876].) In California, however, this is a distinction without a difference. California, along with other jurisdictions, has adopted the superior equities doctrine in all cases of equitable or conventional subrogation. (See *Meyers, supra,* 11 Cal.2d at pp. 101–103; *Jones v. Aetna Casualty & Surety Co., supra,* 26 Cal.App.4th at p. 1724; *Rokeby-Johnson v. Aquatronic International, Inc., supra,* 159 Cal.App.3d at p. 1084; see also *Dixie Nat. Bank v. Empl. Commercial U. Ins.* (1985) 463 So.2d 1147, 1151–1152; *Castleman Constr. Co. v. Pennington* (1968) 222 Tenn. 82 [432 S.W.2d 669, 676].)

There is a dearth of authority discussing the rationale underlying the application of the doctrine of superior equities in California, with the *Meyers* case from 1938 being the last, definitive word from our Supreme Court on this issue. Implicit, but not expressly articulated in *Meyers,* is the notion that subrogation is firmly founded in, and is not easily detached from, equitable principles.

Not all states, however, have embraced the doctrine of superior equities as fully as California. A few jurisdictions have rejected the doctrine altogether, and allow insurers to subrogate whether or not they can demonstrate superior equities. (See *American Liberty Ins. Co. v. AmSouth Bank* (2002) 825 So.2d 786, 791; *Hartford Fire Ins. Co. v. Riefolo Constr. Co.* (1980) 81 N.J. 514 [410 A.2d 658, 662]; *S. C. Nat'l Bank v. Lake City State Bank* (1968) 251 S.C. 500 [164 S.E.2d. 103, 105–106].) Commentators have noted that in the modern world the superior equities rule is both " 'arbitrary . . . and unjust in increasing the burden of the insured because of his foresightedness in insuring.' " (*Riggs, supra,* 646 A.2d 966, 969–970, citing Farnsworth, *Insurance Against Check Forgery* (1960) 60 Colum. L.Rev. 284, 324.)

---

[8] While we disagree with State Farm's contention that the superior equities doctrine does not apply in tort cases in California, we, nonetheless, conclude that the nature of the underlying cause of action is a relevant factor when balancing the respective equities of the parties. (See pt. III.D.2., *post.*)

Some jurisdictions assume the validity of the doctrine of superior equities in cases of equitable subordination, but rule it out when subrogation is conventional. (See *Riggs, supra,* 646 A.2d at pp. 970–071; *Liberty Mutual Ins. Co. v. Thunderbird Bank* (1976) 113 Ariz. 375 [555 P.2d 333, 334–335] (*Thunderbird Bank*).) This line of authority reasons that when subrogation is based on contractual provisions, it is not equitable in nature and consequently is not subject to equitable restraints. (*Riggs, supra,* 646 A.2d at pp. 971–972; *Thunderbird Bank, supra,* 555 P.2d at pp. 336–337.) Following this rationale, a wrongdoer is not relieved of liability merely because the insured took the precaution of insuring against the risk of loss. (*Thunderbird Bank, supra,* 555 P.2d at pp. 337–338.) Put another way, but for the contract between the insured and the insurer, the wrongdoer would be liable to the insured; the wrongdoer therefore suffers no prejudice when that liability is shifted from the insured to the insurer under the terms of the contract between those two parties. (*Ibid.*)

The rationale of this third approach is persuasive. It stands to reason that if an insured is able to seek recovery from a wrongdoer without showing superior equities, an insurer, standing in the insured's shoes, should enjoy the same right. One explanation for the reluctance to place an insurer's rights against third parties on equal footing with those of an insured lies in the fact that an insurer has been paid a premium to assume the risk of loss. This concept is known as the "compensated surety" defense.[9] (See *Mutual Service Cas., supra,* 265 F.3d at p. 626; *Riggs, supra,* 646 A.2d at p. 968; see also *Hartford, supra,* 220 Cal.App.2d at p. 562.)

The compensated surety defense is embodied in the superior equities rule, and is invoked to preclude a compensated surety or insurer from recovering against a third party, who would be liable in a suit directly by the insured, unless the surety or insurer can show superior equities to the third party. (See *Mutual Service Cas., supra,* 265 F.3d at p. 626; *Riggs, supra,* 646 A.2d at p. 968.) California recognizes the compensated surety defense. (See *Meyers,* 11 Cal.2d at pp. 102–103; *Hartford, supra,* 220 Cal.App.2d at p. 562.) However, the fact that an insurer has been compensated for its risk does not, in and of itself, swing the balance in favor of a third party. (*Hartford, supra,* at p. 562.) Rather, compensation is a "fact to be considered, it is no more than that . . . ." (*Ibid.*; see also *Continental, supra,* 83 Cal.App.3d at

---

[9] The compensated surety defense is a vestige from the ancient origins of suretyship. (O'Malley, *Subrogation Against Banks on Forged Checks* (1966) 83 Banking L.J. 659, 660–661.) Historically, compensated sureties were viewed with disfavor because they, unlike gratuitous sureties, who assumed liability for another's obligation because of a blood relationship, friendship, or the expectation of favor, assumed risks calculated to produce profits. (*Ibid.*)

p. 605.) The extent to which compensation is considered depends on the level of fault of the third party. In other words, where the third party is clearly at fault, the fact that the insurer has been compensated is of little consequence. (Compare *Hartford, supra,* 220 Cal.App.2d at p. 562, with *Meyers, supra,* 11 Cal.2d at pp. 102–103, and *Morse, supra,* 151 Cal.App.3d at pp. 687–688.)

While we question the continued vitality of the superior equities rule and the compensated surety defense embodied therein, the law in California is that the doctrine of superior equities applies in all cases of subrogation.[10] (*Meyers, supra,* 11 Cal.2d at pp. 102–103; *Jones v. Aetna Casualty & Surety Co., supra,* 26 Cal.App.4th at p. 1724; *Rokeby-Johnson v. Aquatronic International, Inc., supra,* 159 Cal.App.3d at p. 1084.)

In sum, the doctrine of superior equities applies in the instant case, and the trial court did not err in requiring State Farm, as the subrogating insurer, to establish its superior equity in seeking recovery against respondents.

### D.  *The Trial Court Erred in Granting Summary Judgment*

Having determined that the superior equities rule applies to State Farm's claims, we next determine whether the trial court erroneously interpreted and applied the doctrine in granting summary judgment in favor of respondents.

### 1.  *Required Elements of Subrogation Claim*

The essential elements of an insurer's cause of action for subrogation are as follows: "(a) the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; (b) the claimed loss was one for which the insurer was not primarily liable; (c) the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; (d) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (e) the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; (f) the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; (g) justice requires that the loss be entirely shifted from

---

[10] At the very least, this area of the law would greatly benefit from clarification of its proper application, given that our Supreme Court has not weighed in on the issue since the *Meyers* decision in 1938.

the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (h) the insurer's damages are in a liquidated sum, generally the amount paid to the insured." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra*, 65 Cal.App.4th at p. 1292, italics omitted.)

### 2. *Balancing the Equities*

█ As the elements demonstrate, the aim of equitable subrogation is to shift a loss for which the insurer has compensated its insured to one who caused the loss, or who is legally responsible for the loss caused by another and whose equitable position is inferior to the insurer's. (See *Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra*, 65 Cal.App.4th at pp. 1298–1299; *State Farm Fire & Casualty Co. v. East Bay Municipal Utility Dist.* (1997) 53 Cal.App.4th 769, 778 [62 Cal.Rptr.2d 72].)

In comparing the relative positions of the parties, a court is required to determine who ultimately ought to bear the loss. (*Meyers, supra*, 11 Cal.2d at pp. 101–102.) However, "there is no facile formula for determining superiority of equities, for there is no formula by which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party. The cases in other jurisdictions refer to various factors which spell fault in the . . . third party, but whatever the criteria mentioned each case comes down to the question of fault of some kind . . . ." (*Hartford, supra*, 220 Cal.App.2d at p. 558; see also *Golden Eagle, supra*, 26 Cal.App.4th at p. 175.) "A more balanced statement is that the right of subrogation 'may be invoked against a third party only if he is guilty of some wrongful conduct which makes his equity inferior to that of the [surety or insurer].' [Citations.]"[11] (*Golden Eagle, supra*, at p. 171.)

█ In general, a subrogating insurer has two potential sources of recovery: the direct cause of the loss (e.g., a dishonest employee, burglar, or fire

---

[11] *Continental* characterizes *Meyers, supra*, 11 Cal.2d 92, as approving of the rule that a surety's equity does not become superior to that of the third party merely because that person is guilty of ordinary negligence. (*Continental, supra*, 83 Cal.App.3d at p. 603.) According to *Continental*, " 'culpable negligence' " is required. (*Ibid.*) That is not how we read *Meyers*, which cites *Washington Mechanics' Sav. Bank v. District Title Ins. Co.* (1933) 62 App. D.C. 194 [65 F.2d 827] in support of its holding. *Washington Mechanics' Sav. Bank*, quoted at length by our Supreme Court, involved similar facts as in *Meyers*, and held, " 'We are unable to see any particular in which the equities of the bonding company are superior to those of the appellant bank. Neither one was guilty of culpable negligence in the transaction.' " (*Meyers, supra*, 11 Cal.2d at p. 100 quoting *Washington Mechanics' Sav. Bank*, at p. 830.) We find nothing in *Meyers* requiring "culpable negligence." Rather, the rule from *Meyers* is that the right of subrogation does not exist in favor of an insurer or surety except against persons who participated in the wrongful act. (*Meyers, supra*, at pp. 101–103.)

starter) and the indirect cause of the loss (e.g., a bank, alarm company, or contractual indemnitor). Subrogation against the direct cause of loss is straightforward. The insurer need only show a causal connection between the direct wrongdoer's act or omission and the loss. (See, e.g., *Travelers Indem. Co. v. Ingebretsen* (1974) 38 Cal.App.3d 858, 863–864 [113 Cal.Rptr. 679] [subrogation rights existed against county for property damage caused by construction work, even though recovery was for inverse condemnation and not negligence or intentional wrongdoing].) The direct wrongdoer, having caused the loss, cannot be considered an innocent party. (*Ibid.*) In this situation, an innocent insurer will always have superior equities. (See Veal, *Subrogation: The Duties and Obligations of the Insured and Rights of the Insurer Revisited* (1992) 28 Tort & Ins. L.J. 69, 70–71 (Veal); see also 3 Cal. Insurance Law & Practice (2006) Property Insurance in General, § 35.11[7][a], pp. 35-60–35-61 (Cal. Insurance Law).)

Difficulties arise when weighing the equities of third parties whose conduct contributed to or permitted the loss. (See Veal, *supra*, 28 Tort & Ins. L.J. at pp. 70–71; Cal. Insurance Law, *supra*, § 35.11[7][a], p. 35-61.) In this situation, the third parties may be involved in the circumstances surrounding the loss, with greater or lesser degrees of responsibility. (See Veal, *supra*, 28 Tort & Ins. L.J. at p. 71.) There are somewhat conflicting decisions when an insurer sues one of these third parties. However, "[w]hen the insurer sues one of these third parties, the courts still look for the party who, in good conscience, ultimately ought to bear the loss." (*Id.* at pp. 70–71.) Sometimes called "balancing the equities," the doctrine draws upon the court's concept of fairness. When a third party dealing with a direct wrongdoer is in a better position to avoid the loss, the insurer is said to have superior equities. (See *Continental, supra*, 83 Cal.App.3d at pp. 603–604.)

For example, an insurer will be able to enforce its subrogation rights when a third party is able to prevent a loss by adhering to certain prescribed procedures and a loss occurs because it fails to do so. (Cal. Insurance Law, *supra*, § 35.11[7][b], p. 35-62.)

In *Barclay Kitchen, Inc. v. California Bank* (1962) 208 Cal.App.2d 347 [25 Cal.Rptr. 383] (*Barclay Kitchen*), the insured's bank deviated from its standard procedures at the request of one of the insured's employees. (*Id.* at p. 350.) As a result, the employee was able to embezzle from the insured employer. (*Ibid.*) On these facts, the court held that the insurer could enforce its subrogation rights. (*Id.* at p. 357.) In so holding, the court determined that the bank was not an innocent party, since its negligence made possible the consummation of the employee's fraudulent scheme. (*Ibid.*)

Similarly, in *Hartford, supra*, 220 Cal.App.2d 545, bank employees permitted a depositor to open an account without proper identification. (*Id.* at p. 561.) The depositor then deposited a check that had been forged by an employee of the maker, and the bank employees failed to verify the validity of the check. (*Id.* at p. 549.) The surety of the maker of the check then sued the bank. (*Id.* at pp. 546–547.) In balancing the equities between the bank and the surety, the court determined that it was inconsequential whether the bank's disregard for the rule amounted to negligence since the insurer was without fault. (*Id.* at p. 562.) The bank had constructive knowledge of facts that should have prompted notice and caused it to make inquiries, which if made, would have frustrated the employee's plan. (*Hartford, supra*, 220 Cal.App.2d at p. 562.) The court held that the insurer's equity was superior to that of the bank. (*Ibid.*) In so holding, the court reasoned that the bank, having constructive knowledge and failing to act on it, facilitated the fraud and placed the bank in a position of fault. (*Ibid.*; see also *Commercial Standard Ins. Co. v. Bank of America* (1976) 57 Cal.App.3d 241, 245–247 [129 Cal.Rptr. 91] [insurer entitled to subrogation where a bank negligently disbursed construction loan proceeds contrary to its obligation to inspect the work site].)

On the other hand, in *Meyers, supra*, 11 Cal.2d 92, an insurer was not permitted to maintain a subrogation action against the bank that had accepted forged checks. (*Id.* at p. 103.) There, the insured's manager forged checks payable to the insured and the bank honored the checks in the ordinary course of business. (*Id.* at pp. 93, 102–103.) The court held the bank was an "innocent" third party and even though the bank breached its agreement with the depositor, the breach did not cause the loss. (*Id.* at pp. 102–103.) Rather, the forger was the primary cause of the loss. (*Id.* at p. 103.)

A similar principle was involved in *Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506 [64 Cal.Rptr. 187] (*Patent Scaffolding*). There, an insurer that paid a fire loss of a subcontractor was not entitled to subrogation against the general contractor who had agreed to obtain fire insurance and indemnify the subcontractor against fire loss, but failed to obtain the insurance. (*Id.* at pp. 507–509, 515–516.) The court held that although the general contractor failed to obtain fire insurance as agreed and failed to comply with its indemnity obligations, it did not cause the fire and therefore had no equitable obligation to bear the entire loss as against the subcontractor's insurers. (*Id.* at p. 512.)

Here, the trial court granted summary judgment in favor of respondents relying on the case of *Morse, supra*, 151 Cal.App.3d 681. There, an insurer brought a subrogation action against a group of alarm companies, alleging numerous causes of action, including breach of contract and negligence, for

losses arising from 11 property damage incidents sustained by its insureds. (*Id.* at p. 684.) The insureds operated various commercial establishments, and had each contracted with one of the alarm companies to have burglar or fire alarm systems maintained. (*Id.* at p. 685.) The alarm companies' contract with each of the insureds contained clear and express disclaimers of liability for any losses resulting from burglaries and fires. (*Id.* at pp. 685–686.) "An example of the language contained in the contracts is as follows: [¶] 'Morse does not represent or warrant that the alarm system may not be compromised or circumvented, that the system will prevent any loss by burglary, hold-up, fire or otherwise; or that the system will in all cases provide the protection for which it is installed or intended. Subscriber acknowledges that Morse is not an insurer, that Subscriber assumes all risk for loss or damage to Subscriber's premises or to its contents . . . . [¶] . . . [¶] . . . Morse's obligation hereunder relates solely to the servicing of the specified protective signaling system and Morse is in no way obligated to maintain, repair, service, or to assure the operation of the property . . . . [¶] . . . It is understood and agreed by and between the parties hereto that Morse is not an insurer. Insurance, if any, will be obtained by the Subscriber. Charges are based solely upon the value of the services provided for, and are unrelated to the value of the Subscriber's property . . . [.] The Subscriber does not desire this contract to provide for the liability of Morse and Subscriber agrees that Morse shall not be liable for loss or damage due directly or indirectly to any occurrence or consequences therefrom, which the system is designed to detect or avert. From the nature of the service performed, it is impractical and extremely difficult to fix the actual damages, if any, which may proximately result from the failure on the part of Morse to perform any of the obligations hereunder, or the failure of the system to properly operate with the resulting loss to the Subscriber. If Morse should be found liable for loss or damage due to a failure on the part of Morse or its system, in any respect, its liability shall be limited to the refund to Subscriber of an amount equal to the aggregate of six (6) monthly payments or the sum of Two Hundred Fifty ($250.00) Dollars, whichever sum shall be less, as liquidated damages and not as a penalty. . . .' " (*Id.* at pp. 685–686, italics omitted.)

In each of the 11 incidents, a fire or burglary occurred at the insured's premises. (*Morse, supra,* 151 Cal.App.3d at p. 686.) "The alarm system failed to function properly, either because of mechanical failure or because of the failure of the [a]larm [c]ompanies' personnel to notify police or fire departments upon receiving signals from otherwise properly functioning systems." (*Ibid.*) The insurer alleged that where the alarm companies received alarm signals but failed to notify the proper officials, such " 'knowing' failure amounted to gross negligence." (*Ibid.*) The insurer further alleged that "as a

proximate result of the [a]larm [c]ompanies' breach of its contractual duty or its negligent or grossly negligent acts, the fires or burglaries were not aborted." (*Ibid.*)

There were no allegations that the alarm companies created the fires or perpetuated the burglaries. (*Morse, supra,* 151 Cal.App.3d at p. 687.) The trial court sustained the alarm companies' demurrers, without leave to amend, and dismissed the action. (*Id.* at pp. 684–685.)

The appellate court affirmed the judgment of dismissal, concluding that the insurer could not pursue its subrogation action against the alarm companies: "In the case at bench, [the insurer] has alleged that the [a]larm [c]ompanies' negligence proximately caused the loss [the insurer] insured against. Although [the insurer] attempts to characterize the [a]larm [c]ompanies' breach as an action in tort, in *Better Food Mkts. v. Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179, 187–188 [253 P.2d 10], a case against an alarm company sued for similar failures, the court concluded: 'However, the plaintiff makes no claim that a duty was owed to it outside of that created by the contract, and no breach of duty was alleged other than a failure to render the contracted for service. Although an action in tort may sometimes be brought for the negligent breach of a contractual duty [citation], still the nature of the duty owed and the consequences of its breach must be determined by reference to the contract which created that duty.' " (*Morse, supra,* 15 Cal.App.3d at p. 687.)

The court held that while the alarm companies may have been negligent in performance of their contractual duties, their negligence did not create the harm. (*Morse, supra,* 151 Cal.App.3d at p. 687.) The court went on to hold that the primary cause of loss was the creator of the fire or the burglar and that any alleged negligence of the alarm companies would be secondary to creation of the perils. (*Id.* at p. 688.) The court further concluded that the insureds were in the best position to place a value on the contents of their premises, and that the insurer was in the best position to spread the risk of loss by charging premiums based upon the extent of insurance coverage. (*Ibid.*) Accordingly, the court concluded that the insurer was not "equitably subrogated to any of the insureds' causes of action based on breach of contract or negligence." (*Ibid.*)

The instant case is readily distinguishable from *Morse, supra,* 151 Cal.App.3d 681. There, the defendants' duty to the insureds was contractual in nature, and as such the tort theory of negligence was implicitly not at issue. As discussed, the court in *Morse* expressly rejected the insurer's attempt to characterize the alarm companies' breach as a separate action in tort. (*Id.* at p. 687.) The court referred to the alarm companies' negligence in

the limited context of their contractual duties and concluded that the alarm companies' negligent performance of such duties did not create the harm. (*Ibid.*) *Meyers* rested on similar rationale, which concluded: "Neither the indemnitor [insurance company] nor the bank [alarm company] was the wrongdoer, but by independent contract obligation each was liable to the employer [subscriber/insured]. In equity, it cannot be said that the satisfaction by the bonding [insurance] company of its primary liability should entitle it to recover against the bank [alarm company] upon a totally different liability." (*Meyers, supra,* 11 Cal.2d at p. 102; see also *Patent Scaffolding, supra,* 256 Cal.App.2d at p. 512 [breach of contractual agreement to obtain fire insurance did not cause property loss].)

Here, there is no contractual relationship between State Farm's insureds and respondents. Rather, State Farm's subrogation action is premised on a tort claim, viz., respondents' negligence permitted a fire to occur at the Allen Property and to spread to its insureds' property. This alleged negligence is unlike the breach of contractual duties at issue in *Morse*, *Meyers*, and *Patent Scaffolding*, and is more akin to the negligent failures of the banks in *Barclay Kitchen* and *Hartford*. While it is true *Barclay Kitchen* and *Hartford* also implicitly involved contractual relationships between the banks and the insureds, additional facts established that the banks were not innocent parties because they were able to prevent the losses by adhering to certain proscribed procedures, but failed to do so. Accordingly, the insurers in *Barclay Kitchen* and *Hartford* were held to have superior equities.

In the instant case, both sides take extreme positions with respect to what constitutes a superior equity. State Farm argues that a proximate cause is always a primary cause, and that any degree of fault on part of a third party is sufficient to tip the scales in favor of an innocent insurer. Respondents maintain that they have superior equity since they were not the "primary cause" of the fire (i.e., they did not start it). We find neither contention persuasive.

State Farm's assertion that a proximate cause is always a primary cause is only plausible when an insurer seeks recovery solely from the direct cause of the loss. In that situation, there is no need to differentiate between primary and secondary causes of the loss because there is only one responsible party. (See, e.g., *Travelers Indem. Co. v. Ingebretsen, supra,* 38 Cal.App.3d at pp. 863–864; see also Cal. Insurance Law, *supra,* 35.11[7][a], p. 35-60.) However, where the third party is an indirect cause of the loss, because it contributed to or permitted the loss, the court must differentiate between primary and secondary causes of loss to determine whether the third party was in a better position to avoid the loss. (See *Continental, supra,* 83 Cal.App.3d at pp. 603–604.)

The mere fact that respondents did not start the fire does not automatically mean that they have a superior equitable position over State Farm. *Continental, supra,* 83 Cal.App.3d 593, held that a significant factor in weighing the equities is whether a defendant's negligent acts were *related* to or contributed to the primary cause of loss. (*Id.* at pp. 603–604; see also *Golden Eagle, supra,* 26 Cal.App.4th at p. 171 [fault of third party creating superior equity in surety must be related to the primary cause of the loss].) Respondents subtly alter the language of *Continental,* to argue that it requires that a defendant be *the* primary wrongdoer in order for the insurer to have superior equity.

Contrary to the extreme positions advanced by the parties, we conclude the issue is whether respondents were in a better position to avoid the loss than State Farm or its insureds. (*Continental, supra,* 83 Cal.App.3d 593.) State Farm alleges that respondents negligently permitted the fire to spread to its insureds' property by failing to provide noncombustible metal trash cans, failing to promulgate and post rules establishing a system for the safe disposal of fireplace ashes, and failing to keep combustible materials (i.e., trash cans) a safe distance away from other combustible materials (i.e., wood fencing and siding). The failure to provide for the safe disposal of ashes arguably could be characterized as promoting or encouraging the spread of the fire. Moreover, the implementation of a method for the safe disposal of fireplace ashes, including appropriate trash cans, possibly could have prevented the fire from occurring.

Here, the trial court did not address the question of which party was in a better position to avoid the loss, but summarily concluded that since respondents did not place the ignition source in the trash can they were not the primary cause of the insureds' loss. In reaching this conclusion, the trial court solely relied on *Morse, supra,* 151 Cal.App.3d 681. However, the holding in *Morse* cannot be reconciled with the facts of the instant case, which are rooted in tort. While arguably an insurer should in fairness bear the loss where the third party's liability is solely contractual[12] (see, e.g., *Morse, supra,* 151 Cal.App.3d at pp. 687–688; *Meyers, supra,* 11 Cal.2d at pp. 102–103; *Patent Scaffolding, supra,* 256 Cal.App.3d at p. 512), such a result seems unfair when the loss has been caused by the third party's tortious conduct. (See, e.g., *Federal Insurance Co. v. Arthur Andersen & Co., supra,* 552 N.Ed.2d at p. 875 [negligent accountant could not escape liability

---

[12] There is a decisional split in authority regarding whether an insurer is entitled to subrogation in the absence of a contractual indemnitor's fault. (Compare *Meyers, supra,* 11 Cal.2d at pp. 102–103, and *Patent Scaffolding, supra,* 256 Cal.App.2d at p. 512, with *Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 557–559 [60 Cal.Rptr.2d 591] and *Meyer Koulish Co. v. Cannon* (1963) 213 Cal.App.2d 419, 428–429 [28 Cal.Rptr. 757]; see also *Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1081 [85 Cal.Rptr.2d 627].)

because employer had fidelity insurance].) "Under the law, a tortfeasor generally is liable for all damages proximately caused by his tortious conduct. (See Civ. Code, § 1714.) Where multiple tortfeasors are responsible for an indivisible injury suffered by the plaintiff, each tortfeasor is jointly and severally liable to the plaintiff for those damages and thus may be held individually liable to the injured plaintiff for the entirety of such damages. (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 582, 586–587, 590 [146 Cal.Rptr. 182, 578 P.2d 899] . . . ; *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 600 [7 Cal.Rptr.2d 238, 828 P.2d 140]; *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 633 [65 Cal.Rptr.2d 532].)" (*Expressions at Rancho Niguel Assn. v. Ahmanson Developments, Inc.* (2001) 86 Cal.App.4th 1135, 1139 [103 Cal.Rptr.2d 895].)

The gravamen of State Farm's subrogation claim in the present case is that respondents negligently permitted a fire to occur and to spread to its insureds' property. It seems inequitable to bar State Farm from pursuing its claim against respondents solely because they did not place the ignition source in the trash can. Subrogation advances an important policy rationale underlying the tort system by forcing a wrongdoer who helped to cause a loss to bear the burden of reimbursing the insurer for payments made to its insured as a result of the wrongdoer's acts and omissions. (See Rinaldi, *Apportionment of Recovery Between Insured and Insurer in a Subrogation Case* (1994) 29 Tort & Ins. L.J. 803 (Rinaldi); see also *Patent Scaffolding, supra,* 256 Cal.App.2d at p. 515 [noting that subrogation against tortfeasor serves as a deterrent to wrongdoing].) This rationale has been termed the " 'moralistic basis of tort law as it has developed in our system.' " (Rinaldi, *supra,* 29 Tort & Ins. L.J. at p. 803.)

## CONCLUSION

In the case at bench, the contest is between an innocent insurance company (which admittedly received premiums for the very loss that occurred) and alleged tortfeasors (who did not physically start the fire, but whose negligence allegedly permitted the fire to be started and to spread by failing to provide for the safe disposal of fireplace ashes). On this record, we cannot say that respondents are entitled to judgment as a matter of law, based on the doctrine of superior equities. We reverse the trial court's order granting summary judgment on that basis. However, the motions for summary judgment were also based upon arguments going to the merits of the underlying negligence claims. The trial court never addressed these arguments and based its ruling on respondents' motions for summary judgment solely upon the doctrine of superior equities. Rather than ruling on respondents' arguments regarding the merits of the negligence claim, for the first time on appeal, we remand the case for the trial court to do so. (See, e.g., *Adams v. Pacific Bell*

*Directory* (2003) 111 Cal.App.4th 93, 100–101 [3 Cal.Rptr.3d 365]; see also Code Civ. Proc., § 437c, subd. (m)(2).)

## DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings consistent with this opinion. State Farm shall recover its costs on appeal.

Rivera, J., concurred.

**RUVOLO, P. J.,** Concurring.—

## I.

## INTRODUCTION

I agree with the majority decision, insofar as it applies the superior equities doctrine (doctrine) to a subrogation action brought by an insurer against third parties based on alleged tortious conduct. I do so because we are compelled by our state's hierarchical discipline of stare decisis to follow authoritative Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; *Morrow v. Hood Communications, Inc.* (1997) 59 Cal.App.4th 924, 926 [69 Cal.Rptr.2d 489].) In this case, the antediluvian decision in *Meyers v. Bank of America etc. Assn.* (1938) 11 Cal.2d 92 [77 P.2d 1084] (*Meyers*) represents our Supreme Court's embrace of the doctrine: a decision that our high court has not reexamined since it was first published 68 years ago. Accordingly, we are bound to apply it here. However, while we must follow binding precedent of our high court, as noted by the renowned dean of California appellate practice, the late Bernard Witkin, "though bound, [we] are not gagged." (Witkin, Manual on Appellate Court Opinions (1977) pp. 168–169.)

Therefore, I write separately to express my view that the doctrine is a judicial anachronism, which is inconsistent with our present day comparative fault tort regime. The Supreme Court should align California's subrogation law with those states which have modified or abandoned the doctrine in favor of the modern comparative fault paradigm. As I explain below, comparative fault tort law, including its application to indemnity and contribution claims, has supplanted any need for determining superior equities; a principle which today can have the pernicious consequence of providing a legal safe haven for third party tortfeasors who, under comparative fault standards, would be otherwise liable for indemnity and contribution in a lawsuit brought directly by the insured.

## II.

## ORIGIN AND APPLICATION OF SUPERIOR EQUITIES DOCTRINE

In insurance law, the principle of subrogation dictates that an insurer who has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy. (*Fire Ins. Exchange v. Hammond* (2000) 83 Cal.App.4th 313, 317 [99 Cal.Rptr.2d 596].) Essentially, subrogation allows an insurer that has indemnified an insured to stand in the shoes of the insured on the insured's claim for compensation against a third party. (*Herrick Corp. v. Canadian Ins. Co.* (1994) 29 Cal.App.4th 753, 765 [34 Cal.Rptr.2d 844].)

Doctrinally, the roots of subrogation are equitable in origin. Therefore, since the right of the party seeking subrogation stems from equity, it was seen as a logical adjunct that the doctrine "may be invoked against a third party only if he or she is guilty of some wrongful conduct that makes his or her equity inferior to that of the plaintiff. [Citations.]" (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 187, p. 521; *Jones v. Bank of America* (1942) 49 Cal.App.2d 115, 123 [121 P.2d 94].) Otherwise, equity would perceive no reason to vary the status quo by shifting the financial burden for paying damages. (*Nat. Union Fire Ins. Co. v. Riggs Nat. Bank* (App.D.C. 1994) 646 A.2d 966, 968 (*Riggs*).)

Under the superior equities doctrine, although an insurer might have a subrogation interest in the insured's claim against the third party who caused or contributed to the loss, it cannot enforce its subrogation rights unless it has equities superior to those of the third party. (*Hartford Acc. & Indem. Co. v. Bank of America* (1963) 220 Cal.App.2d 545, 550 [34 Cal.Rptr. 23] (*Hartford*).) The doctrine has also been called the "compensated surety defense," which embodies the view "that the insurer, who has been compensated for issuing the policy, should not be allowed to shift to an innocent party the very loss that the policy contemplated, even though the latter, as between itself and the insured, would be absolutely liable." (Farnsworth, *Insurance Against Check Forgery* (1960) 60 Colum. L.Rev. 284, 320–321, fn. omitted.)

As noted, the doctrine was expressly adopted by our Supreme Court in 1938 (*Meyers, supra,* 11 Cal.2d at pp. 98, 102–103); and as the majority decision explains, an insurer's subrogation of a negligence claim is not currently allowed in California under either legal or conventional terms unless the insurer shows that "justice requires that the loss should be shifted

from the insurer to the defendant, whose equitable position is inferior to that of the insurer . . . ." (*Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 556 [60 Cal.Rptr.2d 591].) However, there is no "facile formula" for determining superiority of equities, especially when the primary cause of the loss is someone other than the party against whom subrogation is sought. (*Hartford, supra,* 220 Cal.App.2d at p. 558.)

As the majority decision points out, the doctrine has been inconsistently applied in cases where an insurer is attempting to enforce its subrogation rights against a defendant whose negligence did not cause the entire loss. Among the many attempts made to define this exquisite balance between the equities favoring the third party tortfeasor and the insurer, there are cases flatly holding that subrogation is not available when the defendant is not the primary cause of the loss. (*Meyers, supra,* 11 Cal.2d at pp. 102–103; *Fireman's Fund Ins. Co. v. Morse Signal Devices* (1984) 151 Cal.App.3d 681, 688 [198 Cal.Rptr. 756].) Other courts have held that an insurer should be allowed to enforce its subrogation rights when the defendant's conduct is "related to the primary cause of the loss." (*Continental Ins. Co. v. Morgan, Olmstead, Kennedy & Gardner, Inc.* (1978) 83 Cal.App.3d 593, 604 [148 Cal.Rptr. 57]; see *Golden Eagle Ins. Co. v. First Nationwide Financial Corp.* (1994) 26 Cal.App.4th 160, 171 [31 Cal.Rptr.2d 815].) Still other courts find the insurer's equities are superior to those of a third party who could have prevented the primary wrongdoer from causing the loss. (*Hartford, supra,* 220 Cal.App.2d at pp. 561–562; *Barclay Kitchen, Inc. v. California Bank* (1962) 208 Cal.App.2d 347, 355 [25 Cal.Rptr. 383] (*Barclay Kitchen*).)

In the face of these conflicting cases, the majority has exerted heroic efforts to reconcile them, and to produce a unitary system for applying the doctrine in subrogation cases based on tortious conduct, not otherwise involving contractual promises. In the course of this analytical struggle, the doctrine's incoherence has been exposed, as courts have tried without success to comport this antiquated principle with modern tort common law. The effort is futile, for only by replacing the rubric of the doctrine with comparative fault principles can subrogation meet its core goal of allowing indemnifying insurers " ' "to stand in the shoes" ' " of its insured on the insured's claim for compensation against a third party. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1292 [77 Cal.Rptr.2d 296].)[1]

---

[1] The Supreme Court has already determined that, in workers' compensation subrogation, comparative fault principles must be applied to determine the amount of an employer's credit towards future compensation benefits where the employee has recovered damages against a third party tortfeasor. (*Associated Construction & Engineering Co. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829, 832–833 [150 Cal.Rptr. 888, 587 P.2d 684].)

## III.

### EVOLUTION OF MODERN DAY COMPARATIVE
### FAULT PRINCIPLES

The superior equities doctrine developed at a time in judicial history when common law precepts precluded any attempt to ascertain comparative fault. As a consequence, the doctrine was entirely consistent with the then-existing concept of "all or nothing" contributory negligence. (*Buckley v. Chadwick* (1955) 45 Cal.2d 183, 192 [289 P.2d 242]; *Innis v. The Steamer Senator* (1851) 1 Cal. 459, 460–461.) Concomitantly, the "all or nothing" rule was also applied to indemnity actions which resulted in a total shifting of liability to the indemnitor/third party tortfeasor, but only where the party seeking indemnity was itself not negligent. (*Cahill Bros., Inc. v. Clementina Co.* (1962) 208 Cal.App.2d 367, 382 [25 Cal.Rptr. 301].)

This extension of the "all or nothing" rule to indemnification was founded on the common law belief that a party seeking indemnification should not be allowed to recover against a third party if the party seeking indemnification was "actively" responsible for causing the loss. Recovery was only permitted where the conduct could be classified as "passive." (*City & County of S. F. v. Ho Sing* (1958) 51 Cal.2d 127, 130 [330 P.2d 802]; *Cahill Bros., Inc. v. Clementina Co., supra,* 208 Cal.App.2d at p. 382.)

Like the doctrine, which ostensibly was created to allow the recovery in subrogation against a third party "primarily" responsible for causing the loss, equitable indemnity also was premised " 'upon a difference between the primary and secondary liability of two persons each of whom is made responsible by the law to an injured party.' " (*Alisal Sanitary Dist. v. Kennedy* (1960) 180 Cal.App.2d 69, 75 [4 Cal.Rptr. 379].) Consistent with this view, cases at the time held that, while a complete shifting of liability to one primarily at fault was allowed under equitable indemnity principles, joint tortfeasors were prevented from obtaining a sharing of legal responsibility under the related doctrine of contribution. (*Id.* at p. 74; *Dow v. Sunset Tel. & Tel. Co.* (1912) 162 Cal. 136 [121 P. 379]; *City & County of S. F. v. Ho Sing, supra,* 51 Cal.2d 127.)[2]

Of course, the legal landscape in tort law changed dramatically in 1975 when the Supreme Court abandoned the "all or nothing" rule of contributory

---

[2] The *Alisal* court noted that the Legislature amended then Code of Civil Procedure section 875 allowing contribution between joint tortfeasors accruing after January 1, 1958. (*Alisal Sanitary Dist. v. Kennedy, supra,* 180 Cal.App.2d at p. 74.) The court then went on to hold that a right of contribution potentially existed because the plaintiff's complaint alleged that the defendant's conduct was negligent and it "created the condition which caused the injury." (*Id.* at p. 79.)

negligence and "superseded [it] by a rule which assesses liability in proportion to fault." (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 810 [119 Cal.Rptr. 858, 532 P.2d 1226].) This decision was followed three years later by *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 597–598 [146 Cal.Rptr. 182, 578 P.2d 899], which extended comparative fault principles to claims seeking equitable indemnity among multiple negligent tortfeasors whose liability for the underlying injury was joint and several.

Since then, comparative fault has been extended and refined, virtually saturating the entire field of tort law with its contemporary equitable precepts. Citing just a few examples, comparative fault principles have been applied to apportion responsibility between a strictly liable defendant and a negligent plaintiff in a product liability action (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 736 [144 Cal.Rptr. 380, 575 P.2d 1162]); to bar a claim for "total" indemnity against a defendant who had settled in good faith directly with the injured party in attempt to limit its potential liability (*Far West Financial Corp. v. D & S Co.* (1988) 46 Cal.3d 796, 807, 816–817 [251 Cal.Rptr. 202, 760 P.2d 399]); to allow the apportionment of fault for a judgment entered against both negligent and strictly liable defendants (*Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 325 [146 Cal.Rptr. 550, 579 P.2d 441]); and to indemnity actions between commercial entities to recover purely commercial losses (*GEM Developers v. Hallcraft Homes of San Diego, Inc.* (1989) 213 Cal.App.3d 419, 430 [261 Cal.Rptr. 626] (*GEM Developers*).)

The facts in this last case are particularly germane inasmuch as the appellate court applied equitable comparative fault to claims both for indemnity and subrogation. In *GEM Developers*, the developer was held liable for more than $3 million to a homeowners' association (Association) for construction defects under theories of negligence, strict liability and breach of warranty. The developer's insurer paid approximately $1 million of this amount to the Association and assigned "all subrogation, indemnity and contribution rights against Hallcraft [the original owner] to the Association." (*GEM Developers, supra,* 213 Cal.App.3d at p. 424.) The appellate court held that the Association was entitled to proceed against Hallcraft on the claims assigned by the insurer. (*Id.* at pp. 433–434.)

In part of its holding, the decision concluded that a tortfeasor was entitled to pursue equitable indemnity against another tortfeasor not sued by the plaintiff. In doing so, the court spoke of the importance equitable comparative fault has come to play in ensuring that losses are shared in proportion to the relative culpability of all those bringing about the damages: "In light of the clear Supreme Court language favoring apportionment of loss among those responsible for the harm on a comparative fault basis, its language granting

defendants a right to seek equitable indemnity from parties not named by the plaintiffs through filing a cross-complaint for equitable indemnification, and its language approving apportionment of loss when strict liability is involved, we conclude a defendant/indemnitee may in an action for indemnity seek apportionment of the loss on any theory that was available to the plaintiff upon which the plaintiff would have been successful. . . . To bar an action on a strict liability theory because of these technical distinctions in pleading and procedure demeans the purpose of comparative equitable indemnity, i.e., an equitable sharing of loss between multiple tortfeasors in proportion to their relative culpability. . . ." (*GEM Developers*, *supra*, 213 Cal.App.3d at p. 430.)

Given the growth of tort law over the last 30 years, it simply is no longer analytically possible to accommodate the doctrine in modern noncontractual subrogation. Only by applying comparative fault principles to tort-based subrogation can the law have the symmetry that courts engaged in the development of tort law over the years have sought to achieve. It is little wonder that other states, as well as modern commentators, have criticized the doctrine, or simply abandoned it.

## IV.

## CRITICISM AND ABANDONMENT OF THE DOCTRINE BY OTHER STATES

As set out in the majority decision, in *Meyers* the California Supreme Court used the doctrine to deny subrogation rights to a surety on a fidelity bond which sought to be subrogated to the rights of its principal, an employer who was the victim of a dishonest employee who forged checks, against the bank which had honored the forged checks. In applying the doctrine, the court reasoned that the paid surety was not entitled to be subrogated to the rights of its insured against a bank which did not actively participate in the fraud perpetrated by the forger. The *Meyers* court stated simply, "We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss." (*Meyers*, *supra*, 11 Cal.2d at p. 103.)

Even in an era when the "all or nothing" rule was rigorously followed in tort cases, it was not long before *Meyers* was subjected to critical academic comment voicing the same concerns that I believe merit abandoning the doctrine now. For example, one commentator questioned how the result in *Meyers* could possibly be considered equitable. "[T]here is little reason for putting the whole loss on the fidelity insurer. . . . [¶] Contribution, obviously an equitable solution . . . , suggests an answer to the problem presented by the principal case. Instead of throwing the entire loss on one or the other of the parties, a result more in keeping with the ideals of equity would be to

hold that the equities of both are equal and so to invoke the doctrine of contribution as if the two were co-sureties." (Note (1938) 27 Cal. L.Rev. 88, 89–90, fn. omitted.) Another commentator echoed the sentiment that the "dilemma" of shifting the entire loss from one innocent party to another innocent party "might be resolved by enforcing contribution. Inasmuch as the law of suretyship is in the process of change, such a suggestion merits consideration, for, under it, equity would more nearly be approximated. It is suggested, as a corollary, that the amount of contribution be allotted in accordance with the respective equities." (Note (1939) 12 So.Cal. L.Rev. 490, 492.)

The doctrine has also received considerable criticism in the opinions of several courts. "[S]erious challenges have been leveled against the usefulness and practicality of the compensated surety defense . . . ." (*S.C. Nat'l Bank v. Lake City State Bank* (1968) 251 S.C. 500 [164 S.E.2d 103, 106].) One exasperated court has noted "[e]xhaustive research has disclosed little direction from other courts (or commentators) as to what factors should be considered in balancing the equities." (*Mellon Bank v. National Union Ins. Co.* (2001) 2001 PASuper 32 [768 A.2d 865, 872].) Another court proclaims, "[T]he phrase [superior equity] is mere language devoid of meaning." (*Standard Accident Ins. Co. v. Pellecchia* (1954) 15 N.J. 162 [104 A.2d 288, 303].)

Important to the case before us, the efficacy of the doctrine has been questioned in cases involving the defendant's alleged negligence. "[I]n these tort actions the insurer-subrogee steps into the shoes of his insured and is bound by the principles of the law of negligence which would control if the insured himself were bringing suit. To say that the subrogee in tort action recovers only if he proves superior equity is merely to complicate a simple situation at law by improperly applying to it the language of equity." (*Standard Acc. Ins. Co. v. Pellecchia, supra*, 104 A.2d at p. 296.)

In the light of this criticism, various jurisdictions have significantly eroded or entirely discarded the doctrine. Some jurisdictions have rejected it outright, and allow insurers to subrogate whether or not they can demonstrate superior equities. (See, e.g., *American Liberty Ins. Co. v. Amsouth Bank* (Ala. 2002) 825 So.2d 786, 791–793; *Hartford Fire Ins. Co. v. Riefolo Const. Co.* (1980) 81 N.J. 514 [410 A.2d 658, 662]; *Federal Ins. Co. v. Arthur Andersen & Co.* (1990) 75 N.Y.2d 366 [552 N.E.2d 870, 876, 553 N.Y.S.2d 291].)

Other courts have employed a rather ingenuous ratio decidendi to circumvent the doctrine. These courts have concluded the doctrine has no application to conventional subrogation, which derives from a contractual agreement between insurer and insured to subrogate. This line of authority reasons that

when the subrogation is based on contractual provisions, it is not equitable in nature and consequently is not subject to the doctrine's equitable restraints. (See, e.g., *Riggs, supra,* 646 A.2d at pp. 971–972; *Liberty Mutual Ins. Co. v. Thunderbird Bank* (1976) 113 Ariz. 375 [555 P.2d 333, 336–337]; *Mutual Service Cas. Ins. v. Elizabeth State Bank* (7th Cir. 2001) 265 F.3d 601, 628; *First Nat. Bank v. American Surety Co.* (1944) 71 Ga.App. 112 [30 S.E.2d 402, 407].)

Still other jurisdictions have held that in cases involving commercial transactions, the enactment of the Uniform Commercial Code (U. Com. Code) has abrogated or modified the superior equities doctrine because the U. Com. Code establishes the insured's rights (to which the insurer succeeds) and the third parties' defenses. (See, e.g., *General Acc. Ins. Co. v. Fidelity & Deposit Co.* (E.D.Pa. 1984) 598 F.Supp. 1223, 1240 [after the adoption of the U. Com. Code, "the 'superior equity' analysis of the past may be obsolete"]; *Hanover Ins. Companies v. Brotherhood State Bank* (D.Kan. 1979) 482 F.Supp. 501, 509.)

The techniques used by some courts to avoid the bite of this clearly obsolete principle has prompted at least one commentator to observe: "[W]hen courts are willing to allow the defense to be circumvented . . . they in reality are seizing upon these devi[c]es only as convenient methods of shattering the fossilized forms which surround a right founded in and at the same time restricted unnecessarily by equity." (O'Malley, *Subrogation Against Banks on Forged Checks* (1966) 83 Banking L.J. 659, 688, fn. omitted.) The time has come to remove this temptation from the reach of California courts.

## V.

## CONCLUSION

Sixty-eight years after the *Meyers* decision was issued, the doctrine is still being applied, albeit haphazardly, in California subrogation cases. However, there clearly has been an erosion of support for the doctrine among courts and commentators that weighs heavily against its continuing vitality. While our Supreme Court has not as yet had an opportunity to revisit *Meyers,* the high court's adoption of comparative fault principles in virtually every other tort context justifies the court's intervention in this case. Indeed, our Supreme

Court has been cognizant in the past of the need that established principles of nonstatutory common law undergo evolutional change in appropriate circumstances. (See, e.g., *Green v. Superior Court* (1974) 10 Cal.3d 616, 640 [111 Cal.Rptr. 704, 517 P.2d 1168]; *Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912]; *Willard v. First Church of Christ, Scientist* (1972) 7 Cal.3d 473, 476 [102 Cal.Rptr. 739, 498 P.2d 987].) Because the "all or nothing" approach embodied in the doctrine clashes with modern concepts of comparative fault, and because the doctrine has been inconsistently applied in the context of secondarily liable tortfeasors, I believe the time has come for its reexamination. I concur.